PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1294
_____

GLORIA SANTIAGO,

Appellant

v.

WARMINSTER TOWNSHIP; POLICE CHIEF MICHAEL
MURPHY; CHRISTOPHER SPRINGFIELD, (RETIRED
DEPUTY CHIEF); LT. JAMES DONNOLLY, III; POLICE
OFFICER FREDERICK KUTZER; POLICE OFFICER
JON OGBORN, INDIVIDUALLY AND AS POLICE
OFFICER FOR CBSRT/WARWICK TOWNSHIP C/O
WARWICK TOWNSHIP C/O WARWICK POLICE
DEPARTMENT; DETECTIVE WAYNE JONES,
INDIVIDUALLY AND AS POLICE OFFICER FOR
CBRST/DOYLESTOWN BOROUGH C/O DOYLESTOWN
BOROUGH POLICE DEPARTMENT; TIM MURPHY,
INDIVIDUALLY AND AS POLICE OFFICER FOR
CBSRT

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 08-cv-02202)
District Judge: Hon. Stewart Dalzell
_____

Argued
October 6, 2010

Before: FUENTES, JORDAN and ALDISERT, *Circuit
Judges*.

(Filed: December 14, 2010)
_____

David F. McComb   [ARGUED]
Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy
1818 Market Street – 13th Fl.
Philadelphia, PA   19103

David H. Oh
Law Offices of David H. Oh
5811 Thomas Avenue
Philadelphia, PA   19143
        *Counsel for Appellant*

Andrew J. Bellwoar   [ARGUED]
Eric M. Brown
Susan L. DiGiacomo
Siana, Bellwoar & McAndrew
941 Pottstown Pike - #200
Chester Springs, PA   19425
        *Counsel for Warminster Township*

Christopher P. Boyle, Sr.   [ARGUED]
John P. Gonzales
Marshall, Dennehey, Warner, Coleman & Goggin
620 Freedom Business Center - #300
King of Prussia, PA   19406
   *Counsel for Michael Murphy, Christopher Springfield,*
   *James Donnolly, Frederick Kutzer, Jon Ogborn,*
   *Wayne Jones and Tim Murphy*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Gloria Santiago appeals from an order of the United States District Court for the Eastern District of Pennsylvania dismissing her claims under 42 U.S.C. § 1983 against Warminster Township ("Warminster" or the "Township") and three of its senior police officers, including the police chief. Santiago claims that she suffered a heart attack after being subjected to excessive force during a raid on her home. Her claims against the officers who conducted the raid were earlier dismissed as untimely, and she has not appealed that order. We thus consider only her claims against the three senior officers, who she alleges planned or acquiesced in the use of excessive force, and against the Township, which she alleges is liable for the police chief's plan because he is a final policymaker for the Township.

We conclude that, under the pleading standard set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct.. 1937 (2009), Santiago has failed to plead sufficient factual matter to give rise to a plausible claim for relief against the senior police officers. Her claim against Warminster also must fail because Santiago has failed to plausibly plead that the police chief's conduct caused her any injury. Accordingly, we will affirm.

## I.      Background[1]

### A.      *Warminster Conducts the "Surround and Call Out" Operation*

On the morning of May 13, 2006, Warminster conducted a "surround and call out" operation at the home of Santiago, a sixty-year-old resident of Warminster. The purpose of the operation was to apprehend Steve Miranda, one of Santiago's grandsons.[2] The operation was carried out by the members of "Alpha Team," a unit of the Central Bucks Special Response Team ("CBSRT"). The CBSRT is a multi-jurisdictional police agency consisting of officers representing eighteen municipalities, including Warminster. The members of Alpha Team were Detective Wayne Jones and Officers Jon Ogborn, Frederick Kutzer, and Tim Murphy. While only Officer Kutzer was employed directly by

---

[1] The background information in this section is taken from Santiago's Third Amended Complaint and is set forth as if true.

[2] The arrest warrant for Steve Miranda also named two other individuals, though the record does not state whether they were expected to be found at Santiago's home.

4

Warminster, all outside personnel and equipment were placed under the temporary control of Warminster for purposes of the May 13th operation.

At the commencement of the operation, the occupants of Santiago's home were awakened by police using a public address system. Santiago and her daughter, Gloria Cotte, looked through a window to see an armored vehicle and officers wearing combat uniforms and carrying automatic weapons. Upon seeing Cotte looking through the window, one of the officers asked her who else was in the house, to which she responded "just my family ... this is the Santiago family." (Third Am. Compl. at ¶ 35.) The officer then ordered everyone to exit the house one at a time.

Santiago was the first to come out and was commanded, at gun point, to raise her hands and walk toward the officers. When she did not raise her hands as high as an officer wanted, she was ordered to raise them higher or else be shot. When Santiago reached the officers, Officer Ogborn conducted a pat down search, which revealed no weapons but, humiliating though it was for Santiago, included touching her breasts and crotch. He then restrained her hands behind her back with a plastic zip-tie and seated her on the ground next to the police vehicle. Santiago was frightened and complained of chest pain.

After Santiago left the house, she was followed by Steve Miranda and Jonathan Miranda (her two grandsons), Herminia Miranda (her granddaughter), and Cotte (her daughter). Her two grandsons were patted down, handcuffed, and seated on the ground near Santiago. Her daughter and

5

granddaughter were patted down but not handcuffed or seated.

Even after the police had arrested Steve Miranda – the only occupant for whom they had a warrant – Santiago remained seated and restrained. The officers instructed her and Cotte to sign a consent form allowing a search of the home. Santiago, who speaks no English and cannot read or write, did not sign and, of course, could not have unless they unbound her hands. Cotte, who later said she "felt coerced," did sign.

Santiago sat with her hands tied for approximately thirty minutes as her home was searched. Throughout that time, she was unable to interfere, was not a flight risk, and presented no danger. She continued to complain of pain and eventually told Jonathan Miranda that she felt pain in her heart. Jonathan Miranda told the officers that his grandmother was having a heart attack, and an ambulance was summoned to take her to the hospital.

B.    *Santiago's Complaints are Filed and Dismissed*

On May12, 2008 – one day before the expiration of the statute of limitations – Santiago filed her initial complaint in the District Court, citing constitutional violations and state law tort claims and naming Warminster, Warminster's police department, John Doe police officers, and CBSRT as defendants. For reasons not pertinent here, the bulk of that complaint was dismissed, including all counts against the Warminster police department (because it was not a separate legal entity from Warminster) and CBSRT (for insufficient service of process), and, after a series of amended complaints

6

and further dismissals, the operative pleading left in the case is Santiago's Third Amended Complaint. That complaint is framed in two counts: (1) a §§ 1983 and 1988 claim against Warminster and the individual defendants for violation of the Fourth Amendment; and (2) state law claims against the individual defendants for assault, battery, false arrest, false imprisonment, and harm resulting from a state created danger. Unlike earlier versions of the complaint, the Third Amended Complaint replaced "John Does" with the names of the officers on the scene, identifying Detective Jones and Officers Ogborn, Kutzer, and Murphy. The Third Amended Complaint also added, for the first time, allegations against three Warminster police officers claimed to have been involved in planning and supervising the operation: Chief of Police Michael Murphy, Lieutenant Christopher Springfield, and Lieutenant James Donnelly, III (collectively, the "Supervising Officers").

The entirety of the allegations against the Supervising Officers were contained in three paragraphs:

> Chief Michael Murphy is Police Chief of Warminster Township Police Department. Chief Murphy is a founding member and director of the CBSRT. Although Chief Murphy was not present at the scene on May 13, 2006, he ordered and approved the plan to execute the arrest warrants. This early morning "surround and call out" operation specifically sought to have all occupants exit the Plaintiff's home, one at a time, with hands raised under threat of fire, patted down for weapons, and then handcuffed until the home had been

7

cleared and searched. Chief Murphy violated Plaintiff's Fourth Amendment rights in that this plan used excessive force in restraining Plaintiff, a non-target occupant who presented no threat or risk, for a lengthy period of time and used coercion in obtaining her consent to search the premises.

Christopher Springfield was a police officer with Warminster Township Police Department. On May 13, 2006, he held the rank of Lieutenant and was in [sic] placed in charge of the "surround and call out" operation by Chief Murphy. Lt. Springfield was responsible for all assets including the CBSRT and Warminster Township Police Officers. Lt. Springfield violated Plaintiff's Fourth Amendment rights in that he permitted the use of excessive force in restraining Plaintiff, a non-target occupant who presented no threat or risk, for a lengthy period of time and used coercion in obtaining her consent to search the premises.

Lt. James Donnelly is an officer with the Warminster Township Police Department. On May 13, 2006, he was also the Tactical Team Leader of CBSRT. Chief Murphy ordered Lt. Donnelly to plan and help execute an early morning "surround and call out" operation which sought to have all occupants exit the Plaintiff's home, one at a time, with hands raised under threat of fire, patted down for weapons, and then handcuffed until the home

8

had been cleared and searched. Lt. Donnelly violated Plaintiff's Fourth Amendment rights in that this plan used excessive force in restraining Plaintiff, a non-target occupant who presented no threat or risk, for a lengthy period of time, and used coercion in obtaining her consent to search the premises. As Tactical Team Leader of CBSRT, Lt. Donnelly was responsible for the actions of Alpha Team.

(Third Am. Compl. at ¶¶ 21-23.)

Both Warminster and the individual defendants moved to dismiss and on December 23, 2009, the District Court issued an opinion granting the motion. First, the Court dismissed the claims against the officers of Alpha Team as barred by the statute of limitations.[3] Next, the Court

---

[3] Because the individual officers were not identified by name until after the expiration of the statute of limitations, the Court held that the claims against them would survive only if, under Federal Rule of Civil Procedure 15(c), the amended claims related back to the filing date of the original complaint. That required the individual officers to have had notice of the suit within 120 days of the filing of the original complaint. The Court found that there was no evidence that the members of Alpha Team had such notice. The Court went on to hold, however, that notice could be imputed to the Supervising Officers based on their "identity of interest" with Warminster's police department. Consequently, it dismissed only the claims against the officers of Alpha Team under the statute of limitations.

dismissed the Fourth Amendment claims against the Supervising Officers because it held that Santiago had alleged only *respondeat superior* liability as to them but that government officials cannot be liable for constitutional violations on that basis. The Court then dismissed the claim against Warminster because Santiago had not alleged that Chief Murphy was a "final policymaker," which is a necessary element of the claim Santiago attempted to assert against the Township. Finally, because it had dismissed all of Santiago's federal claims, the Court declined to exercise pendent jurisdiction over the state law claims and dismissed them, without prejudice. Santiago's timely appeal to us followed.

## II.    Discussion[4]

On appeal, Santiago argues that the District Court erred by dismissing the claims against the Supervising Officers and Warminster. Our review of the District Court's decision to grant the motions to dismiss is plenary. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009). We take as true all the factual allegations of the Third Amended Complaint and the reasonable inferences that can be drawn from them, *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n. 27 (2010), but we disregard legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct.. at 1949. "To survive a motion to dismiss, 'a complaint must contain

---

[4] The District Court had jurisdiction over Santiago's claims pursuant to 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sheridan*, 609 F.3d at 262 n.27 (quoting *Iqbal*, 129 S. Ct.. at 1949). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*

A.      *Santiago's Claims Against the Supervising Officers*

We address first the dismissal of Santiago's claims against the Supervising Officers. The District Court dismissed those claims because it held that Santiago had not pled any basis of liability in the Supervising Officers' own acts but, instead, had alleged only a theory of *respondeat superior* liability, which cannot serve as the basis of a claim for constitutional violations. *See Iqbal*, 129 S. Ct.. at 1948 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). While we conclude that the Third Amended Complaint can be read as alleging liability based on the Supervising Officers' own acts, we will nevertheless affirm the District Court's ruling because those allegations fail to meet the pleading requirements set forth by the Supreme Court in *Twombly* and *Iqbal*.

1.      *The Nature of Santiago's Claims*

Liability based on *respondeat superior* arises "solely on the basis of the existence of an employer-employee relationship," regardless of whether the employer had any part in causing harm. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 692 (1978). Contrary to the District

Court's view, that is not the theory Santiago advances. Instead, Santiago's allegations appear to invoke a theory of liability under which "a supervisor may be personally liable … if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."[5] *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile*

---

[5] At oral argument, the Supervising Officers asserted that a supervisory liability claim was unavailable to Santiago because that claim had been dismissed from an earlier version of the complaint. That assertion is not only inconsistent with the briefing, in which the Supervising Officers described supervisory liability as Santiago's "only claim[] against the Appellees" (Appellee's Reply Brief at 24), it also evidences a misunderstanding of the record and our precedents.

While a claim of "failure to train and supervise" was asserted in and dismissed from Santiago's Second Amended Complaint, that claim was brought only against Warminster, and its dismissal does not foreclose the claims brought against the Supervising Officers. Furthermore, as we have noted elsewhere, "[t]here are two theories of supervisory liability," one under which supervisors can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," and another under which they can be liable if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (second alteration in original). The claim against Warminster that was dismissed from the Second Amended Complaint pertained only to the first theory of supervisory liability,

12

*Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Specifically, Santiago alleges that Chief Murphy and Lt. Donnelly developed a plan that "sought to have all occupants exit the Plaintiff's home, one at a time, with hands raised under threat of fire, patted down for weapons, and then handcuffed until the home had been cleared and searched." (Third Am. Compl. at ¶¶ 21, 23.) The claim is thus that, through the creation and authorization of the plan, Chief Murphy and Lt. Donnelly "directed others to violate [Santiago's rights]." *A.M.*, 372 F.3d at 586. The related allegation that Lt. Springfield, as the person in charge of the operation, "permitted the use of excessive force" appears to be a claim that Lt. Springfield "acquiesced in his subordinates' violations."[6] *A.M.*, 372 F.3d at 586. Consequently, although

while the claim at issue against the Supervising Officers pertains primarily to the second. Accordingly, the dismissal of the "failure to train and supervise" claim against Warminster is not of significance to our review of the present supervisory liability claim against the Supervising Officers.

[6] At oral argument, Santiago stated that, like Lt. Springfield, Lt. Donnelly's liability was also based on acquiescence, rather than on having directed the use of force. The Third Amended Complaint, however, states that Lt. Donnelly is liable because he helped plan the operation and "the plan used excessive force," whereas it states that Lt. Springfield was liable because "he permitted the use of excessive force." Thus, we read the allegations as claiming that Lt. Donnelly, like Chief Murphy, directed others to use excessive force, whereas Lt. Springfield acquiesced in the use of force. The distinction is not ultimately important, however, as the claims fail either way.

the Third Amended Complaint seeks a species of supervisory liability, it is not *respondeat superior* liability.

### 2. *The Sufficiency of Santiago's Pleadings*

That Santiago has alleged supervisory liability claims does not mean that she has supported those allegations with "'sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Sheridan*, 609 F.3d at 262 n.27 (quoting *Iqbal*, 129 S. Ct.. at 1949), as is required by the seminal Supreme Court decisions in *Iqbal* and *Twombly.* To determine the sufficiency of a complaint under the pleading regime established by those cases, a court must take three steps:  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal*, 129 S. Ct. at 1947. [7]   Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.*

---

[7] *Iqbal* describes the process as only a "two-pronged approach." 129 S. Ct.. at 1950. It preceded that description, however, by noting that it is often necessary to "begin by taking note of the elements a plaintiff must plead to state a claim." *Id.* at 1947. Thus, we view *Iqbal* as outlining three steps.

14

### a)  The elements of Santiago's claims

Our initial task is to "tak[e] note of the elements [Santiago] must plead" in order to state a claim of § 1983 liability. *See Iqbal*, 129 S. Ct.. at 1947-48 (identifying "[t]he factors necessary to establish a *Bivens* violation" in order to determine what "the plaintiff must plead and prove").

To state a claim of supervisory liability against Chief Murphy and Lt. Donnelly, at least of the kind that it appears Santiago is advancing, she must plead that they "directed others to violate [her rights]," *A.M.*, 372 F.3d at 586. Of course, Chief Murphy and Lt. Donnelly could only be liable if the people they supposedly directed to violate her rights actually did so; otherwise, "the fact that [Chief Murphy and Lt. Donnelly] might have [directed] the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Thus, any claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates. In addition, a plaintiff must allege a causal connection between the supervisor's direction and that violation, or, in other words, proximate causation.

Proximate causation is established where the supervisor gave directions that the supervisor "knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988); *see also Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). Particularly after *Iqbal*, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to "demonstrate

15

a 'plausible nexus' or 'affirmative link' between the [directions] and the specific deprivation of constitutional rights at issue." *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (internal quotation marks and citation omitted). Therefore, to state her claim against Chief Murphy and Lt. Donnelly, Santiago needs to have pled facts plausibly demonstrating that they directed Alpha Team to conduct the operation in a manner that they "knew or should reasonably have known would cause [Alpha Team] to deprive [Santiago] of her constitutional rights." *Conner*, 847 F.2d at 397.

As to her claim against Lt. Springfield, Santiago must allege facts making it plausible that "he had knowledge of [Alpha Team's use of excessive force during the raid]" and "acquiesced in [Alpha Team's] violations."[8] *A.M.*, 372 F.3d at 586.

---

[8] Numerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after *Iqbal*. *See, e.g., Bayer v. Monroe*, 577 F.3d 186, 190 n.5 (3d Cir. 2009) ("In light of the Supreme Court's recent decision in [*Iqbal*], it is uncertain whether proof of such personal knowledge, with nothing more, would provide a sufficient basis for holding [defendant] liable with respect to plaintiffs' Fourteenth Amendment claims."); *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010) (noting the "important questions about the continuing vitality of supervisory liability under § 1983 after the Supreme Court's recent decision in *Ashcroft v. Iqbal*"); *Parish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) ("The Supreme Court's recent pronouncement in *Iqbal* may further restrict the incidents in which the 'failure to supervise' will result in liability."). Because we hold that Santiago's pleadings fail even under our

16

> b) *The allegations that are not*
> *entitled to the assumption of truth*

Having identified the elements of Santiago's claims, *Iqbal* directs that the next step is to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct.. at 1950. In other words, "[we] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210-11. We also disregard "naked assertions devoid of further factual enhancement" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct.. at 1949.

Santiago alleges that the plan developed and authorized by Chief Murphy and Lt. Donnelly "specifically sought to have all occupants exit the Plaintiff's home, one at a time, with hands raised under threat of fire, patted down for weapons, and then handcuffed until the home had been cleared and searched." Because this is nothing more than a recitation of what Santiago says the Alpha Team members did to her, it amounts to a conclusory assertion that what happened at the scene was ordered by the supervisors. While the allegations regarding Alpha Team's conduct are factual and more than merely the recitation of the elements of a cause of action, the allegation of supervisory liability is, in essence, that "Murphy and Donnelly told Alpha team to do what they

---

existing supervisory liability test, we need not decide whether *Iqbal* requires us to narrow the scope of that test.

17

did" and is thus a "formulaic recitation of the elements of a [supervisory liability] claim," *Iqbal*, 129 S. Ct.. at 1951 (internal quotation marks omitted) – namely that Chief Murphy and Lt. Donnelly directed others in the violation of Santiago's rights. Saying that Chief Murphy and Lt. Donnelly "specifically sought" to have happen what allegedly happened does not alter the fundamentally conclusory character of the allegation. [9]

Our conclusion in this regard is dictated by the Supreme Court's decision in *Iqbal*. The plaintiff's claim in that case required proving that the defendants, Attorney General John Ashcroft and FBI Director Robert Mueller, had "adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group." 129 S. Ct.. at 1951. The Court disregarded allegations that "petitioners knew of, condoned, and willfully and maliciously agreed to subject [respondent] to harsh conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin" and that "Ashcroft was the principal

---

[9] We recognize that Santiago's allegations against Chief Murphy and Lt. Donnelly are not precisely of the "they said to do it" variety because there are some distinctions between what Santiago alleges happened and what Santiago alleges was ordered. In particular, Santiago alleges that the Supervising Officers ordered everyone to be handcuffed but that certain occupants were not actually handcuffed. Nonetheless, the breadth and conclusory nature of Santiago's allegations are such that they appear to us to be, in practical effect, indistinguishable from purely "they said to do it" allegations.

architect of this invidious policy, and that Mueller was instrumental in adopting and executing it." *Id.* (internal quotation marks omitted). The Supreme Court called those allegations "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." *Id.* (internal quotation marks omitted). The Court emphasized that the claims required dismissal not because they were fanciful, but because they were conclusory. *Id.* Likewise, in this case where Santiago is required to prove that the Supervising Officers directed others to use excessive force, an allegation that the plan "specifically sought" that use of force is nothing more than a formulaic recitation of the elements of a supervisory liability claim and hence is not entitled to the assumption of truth. The same is true for Santiago's allegation that Lt. Springfield "permitted the use of excessive force," which is nothing more than a conclusory statement that he acquiesced in his subordinates' violations.

In short, Santiago's allegations are "naked assertion[s]" that Chief Murphy and Lt. Donnelly directed Alpha Team to conduct the operation in the allegedly excessive manner that they did and that Lt. Springfield acquiesced in Alpha Team's acts. As mere restatements of the elements of her supervisory liability claims, they are not entitled to the assumption of truth. However, it is crucial to recognize that our determination that these particular allegations do not deserve an assumption of truth does not end the analysis. It may still be that Santiago's supervisory liability claims are plausible in light of the non-conclusory factual allegations in the complaint. We therefore turn to those allegations to determine whether the claims are plausible.

19

### c) The plausibility of Santiago's claims

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct.. at 1949. Other than the conclusory allegations just discussed, the remaining allegations regarding the Supervising Officers are as follows:

> Chief Michael Murphy is Police Chief of Warminster Township Police Department. Chief Murphy is a founding member and director of the CBSRT. Although Chief Murphy was not present at the scene on May 13, 2006, he ordered and approved the plan to execute the arrest warrants. …
>
> Christopher Springfield was a police officer with Warminster Township Police Department. On May 13, 2006, he held the rank of Lieutenant and was in placed in [sic] charge of the "surround and call out" operation by Chief Murphy. Lt. Springfield was responsible for all assets including the CBSRT and Warminster Township Police Officers. …
>
> Lt. James Donnelly is an officer with the Warminster Township Police Department. On May 13, 2006, he was also the Tactical Team Leader of CBSRT. Chief Murphy ordered Lt. Donnelly to plan and help execute an early morning "surround and call out" operation … .

20

As Tactical Team Leader of CBSRT, Lt. Donnelly was responsible for the actions of Alpha Team. …

(Third Am. Compl. at ¶¶ 21-23.)

For purposes of analyzing the motions to dismiss, we take those factual allegations as true and also accept as accurate the factual allegations regarding Alpha Team's execution of the operation. In summary, the allegations against Alpha Team are that the officers ordered everyone to exit the house one at a time; that Santiago exited first under threat of fire; that Santiago was patted down in a demeaning fashion, found to be unarmed, and subsequently handcuffed; that the remaining occupants of the home then exited, some of whom were handcuffed while others were not; that Santiago's daughter was coerced into consenting to a search of the home; and that Santiago was left restrained for thirty minutes while her home was searched, during which time she had a heart attack.

The question then becomes whether those allegations make it plausible that Chief Murphy and Lt. Donnelly directed Alpha Team to conduct the operation in a manner that they "knew or should reasonably have known would cause [Alpha Team] to deprive [Santiago] of her constitutional rights," *Conner*, 847 F.2d at 397, or that Lt. Springfield "had knowledge [that Alpha Team was using excessive force during the raid]" and "acquiesced in [Alpha Team's] violations." *A.M.*, 372 F.3d at 586.

>*(1)  The plausibility of the claims against Chief Murphy and Lt. Donnelly*

First, with respect to Chief Murphy and Lt. Donnelly, we consider whether the fact that they planned the operation coupled with the fact that the operation resulted in excessive force against Santiago makes it plausible that the plan called for the use of excessive force.  We conclude that it does not.  Santiago has only alleged that excessive force was used against her.  The complaint does not allege that any other occupant was threatened with fire.  It specifically states that the other women were not handcuffed.  It does allege that the two grandsons were handcuffed, but one of them was the subject of the arrest warrant and there are no allegations stating whether the other was found to be armed or a risk of flight.  Consequently, there is no basis in the complaint to conclude that excessive force was used on anyone except Santiago.  Even if someone else had been subjected to excessive force, it is clear that the occupants were not being treated uniformly.  Thus, Santiago's allegations undercut the notion of a plan for all occupants to be threatened with fire and handcuffed.  While it is possible that there was such a plan, and that Alpha Team simply chose not to follow it, "possibility" is no longer the touchstone for pleading sufficiency after *Twombly* and *Iqbal*.  Plausibility is what matters.  Allegations that are "merely consistent with a defendant's liability" or show the "mere possibility of misconduct" are not enough.  *Iqbal*, 129 S. Ct.. at 1949-50 (internal quotation marks omitted).  Here, given the disparate treatment of the occupants of the home, one plausible explanation is that the officers simply used their own discretion in determining how to treat each occupant.  In

22

contrast with that "obvious alternative explanation" for the allegedly excessive use of force, the inference that the force was planned is not plausible. *Id.* at 1951-52 (quoting *Twombly*, 550 U.S. at 567).

Where, as here, an operation results in the use of allegedly excessive force against only one of several people, that use of force does not, by itself, give rise to a plausible claim for supervisory liability against those who planned the operation. To hold otherwise would allow a plaintiff to pursue a supervisory liability claim anytime a planned operation resulted in excessive force, merely by describing the force used and appending the phrase "and the Chief told them to do it." *Iqbal* requires more.

> *(2)    The plausibility of the claim against Lt. Springfield*

We next ask whether the allegation that Lt. Springfield was placed in charge of the operation, coupled with what happened during the operation, makes it plausible that Lt. Springfield knew of and acquiesced in the use of excessive force against Santiago. Again, we conclude that it does not. The complaint implies but does not allege that Lt. Springfield was present during the operation. Assuming he was present, however, the complaint still does not aver that he knew of the allegedly excessive force, nor does it give rise to the reasonable inference that he was aware of the level of force used against one individual. *See McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3rd Cir. 2009) (holding that a supervisor's presence "in the vicinity of the arrest at some point after [plaintiff] was handcuffed … is not a legally

23

sufficient evidentiary basis" to find knowledge and acquiescence).  Consequently, the allegations are insufficient to "nudge [Santiago's] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In sum, while Santiago's complaint contains sufficient allegations to show that the Supervising Officers planned and supervised the operation and that, during the operation, Alpha Team used arguably excessive force, her allegations do nothing more than assert the element of liability that the Supervising Officers specifically called for or acquiesced in that use of force.  As a result, her allegations may "get[] the complaint close to stating a claim, but without further factual enhancement [they] stop[] short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks and alterations omitted).  Because the Third Amended Complaint does not give rise to a plausible claim for relief against the Supervising Officers, the District Court did not err in dismissing the claims against them.[10]

---

[10] The Third Amended Complaint was filed after the close of discovery.  Consequently, there is no reason to believe that Santiago's conclusory allegations were simply the result of the relevant evidence being in the hands of the defendants.  Under *Iqbal*, however, the result would be the same even had no discovery been completed.  We recognize that plaintiffs may face challenges in drafting claims despite an information asymmetry between plaintiffs and defendants.  Given that reality, reasonable minds may take issue with *Iqbal* and urge a different balance between ensuring, on the one hand, access to the courts so that victims are able to obtain recompense and, on the other, ensuring that

## B. *Santiago's Claim Against Warminster*

We now turn to the dismissal of Santiago's claim against Warminster. The District Court dismissed that claim because Santiago had failed to allege that Chief Murphy was a final policymaker, which, under *Monell*, was necessary to the survival of her claim against the Township. Santiago offers two arguments for why the dismissal was improper. First, she argues that, while she may not have used the words "final policymaker," "the factual averments of the complaint are more than sufficient to show that Chief Murphy was the 'final policymaker' with respect to the tactical decisions made here." (Appellant's Opening Brief at 23.) Second, she argues that the District Court applied the wrong standard – considering whether Chief Murphy was a final policymaker as a factual question instead of a legal one, as required under Supreme Court precedent. Not only are those arguments inconsistent, they miss the point. The dispositive point is that, whether or not Chief Murphy is a final policymaker, Santiago has failed to plead facts showing that his plan caused her injury.

---

municipalities and police officers are not unnecessarily subjected to the burdens of litigation. *See* Arthur R. Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 DUKE L.J. 1, 2 (2010) (arguing that *Twombly* and *Iqbal* give "too much attention to claims … of expense and possible abuse and too little on citizen access, a level litigation playing field, and the other values of civil litigation"). The Supreme Court has struck the balance, however, and we abide by it.

Under *Monell*, for municipal liability to attach, any injury must be inflicted by "execution of a government's policy or custom." 436 U.S. at 694. Drawing all factual inferences in favor of Santiago, as is required at this juncture, we nevertheless cannot conclude that the Third Amended Complaint alleges municipal liability. The complaint does not allege that Chief Murphy had policymaking authority,[11] nor does it allege what action he took that could fairly be said to be policy. The allegation that Chief Murphy ordered a plan to execute arrest warrants does not imply the existence of an official policy in violation of Santiago's constitutional rights. *See McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (a claimant "must identify a custom or policy, and

---

[11] While Santiago is correct that, whether Chief Murphy is a final policymaker is ultimately a legal rather than a factual question, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988), that does not relieve her of the obligation to plead in some fashion that he had final policy making authority, as that is a key element of a *Monell* claim. In any event, as a matter of Pennsylvania state law, a township Police Chief is not a final policymaker. *See* 53 PA. STAT. ANN. § 66902 (vesting authority over the "organization and supervision" of township police officers with the township board of supervisors); *Hicks v. Warminster Township*, No. Civ. A. 00-2895, 2001 WL 1159750, at *3 (E.D.Pa. July 26, 2001) ("In such townships, all of the policymaking power, including over the local police force, is vested in the town supervisors."). Moreover, the Supreme Court has forbidden courts from "assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 125 n.1, 126.

26

specify what exactly that custom or policy was"); *see also McGreal v. Ostrov*, 368 F.3d 657, 685 (7th Cir. 2004) ("[T]he plaintiff must first allege that a defendant is a final policymaker. Only then can a court proceed to the next question of whether the single act or single decision of that defendant constituted municipal policy.") More to the point, though, we have already held that Santiago's pleadings fail to plausibly allege that Chief Murphy directed others to violate her rights. Thus, even if Chief Murphy were a final policy maker and his plan were deemed to be official Warminster policy, Santiago has failed to properly plead that the plan was the source of her injury. Therefore, she has not shown that her injury was inflicted by "execution of [Warminster's] policy or custom," *Monell*, 436 U.S. at 694, and she has no claim against the Township.

## III. Conclusion

For the foregoing reasons, we will affirm the District Court's order dismissing Santiago's claims.

27