# United States Court of Appeals
## For the First Circuit

No. 17-2206

MARK GILBERT,

Plaintiff, Appellant,

v.

CITY OF CHICOPEE; WILLIAM JEBB; JOHN PRONOVOST; RICHARD J. KOS,

Defendants, Appellees,

JOHN DOE; JANE DOE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Shawn P. Allyn, with whom Allyn & Ball, P.C. was on brief, for appellant Mark Gilbert.

John J. McCarthy, with whom Doherty, Wallace, Pillsbury and Murphy, P.C. was on brief, for appellee William Jebb.

John T. Liebel, with whom Law Office of John T. Liebel was on brief, for appellee John Pronovost.

Nancy Frankel Pelletier, with whom David S. Lawless and Robinson Donovan, P.C. were on brief, for appellees City of Chicopee and Richard J. Kos.

February 8, 2019

**THOMPSON, <u>Circuit Judge.</u>**

## PREFACE

After a near decade-long saga within the fragmented City of Chicopee Police Department, Plaintiff-Appellant Mark Gilbert, a Captain in the police department, sued a host of Defendants-Appellees, including the City of Chicopee, Police Chief William Jebb, Mayor Richard J. Kos, and fellow police officer John Pronovost, seeking redress under 42 U.S.C. § 1983 and various state laws.[1]  From what we can glean, Gilbert claims his First Amendment rights were violated after appellees improperly targeted him for "speaking out and participating in a government investigation." In this appeal (which causes us to seriously ponder "who's policing the police?"), Gilbert seeks reversal of the district court's dismissal of his claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  Finding no reason to reverse, we close the curtain on this workplace drama.

## GETTING OUR FACTUAL BEARINGS

In sharing this tale, we construe the facts of the complaint in the light most favorable to Gilbert. <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 7 (1st Cir. 2011) (citing Fed. R. Civ. P. 12(b)(6)).  While doing so, we observe, as did the district

---

[1] Although Gilbert named Defendants Jane and John Doe in the caption of his amended complaint, they were not mentioned in its body.

court, that Gilbert's one-hundred-eighty-one paragraph complaint is particularly difficult to follow.[2]  Because the district court already parsed as best it could the facts drawn from Gilbert's complaint and gave the narrative some coherence, we provide and adopt the district court's recitation of facts contained in its November 14, 2017 Memorandum and Order Regarding Defendants' Motions to Dismiss (and we thank the district court for its herculean effort).

> Over at least the past decade, [Gilbert] has been a police officer for the City of Chicopee. Defendants Jebb and Pronovost were fellow officers during this time.  In 2007, Defendant Pronovost fell into a depression after his wife died, and he began behaving strangely at work.[*]  At some point, [Gilbert] complained about this behavior to [] Jebb, who was at the time Captain of his shift.  Nothing was done in response to [Gilbert]'s complaint.  Thereafter, on an unspecified date in December, [Gilbert] and Pronovost

---

[2] The district court underscored that Gilbert's "complaint wavers back and forth chronologically and sometimes offers disconnected narratives, with links between the factual allegations and [Gilbert]'s supposed injuries often difficult to discern."  Gilbert v. City of Chicopee, No. 3:16-cv-30024-MAP, 2017 WL 8730474, at *1 (D. Mass. Nov. 14, 2017).  Indeed, "[i]mportant details confusingly appear for the first time only after the Statement of Facts."  Id. at *4 (emphasis in original).  For example, the district court pointed to "a reference to an email sent by Defendant Jebb regarding one 'Lieutenant Watson' on September 12, 2014" that "appears out of the blue in the text of Count 3" and noted that "critical factual details, such as the timing and nature of the supposed 'pretextual discipline' are simply absent from the complaint."  Id.

[*]  We pause to note this strange behavior Gilbert speaks of took place in the Police Department's booking and cellblock areas and involved Pronovost's efforts to communicate with the dead using crystal rocks tied to strings, and hardware store lights which he called "ghost traps."

got into an argument about Pronovost's behavior.  During the interchange, Pronovost allegedly pulled out his gun and pointed it at [Gilbert].  [Gilbert] verbally reported the incident to his commanding officer Thomas Charette.[2]

> [2][Gilbert] alleges that Jebb was in the room with [him] and Pronovost during this incident.  However, [] Jebb disputes [Gilbert]'s version, stating that the event in question "never happened."

Again, nothing was done.

In 2012, [Gilbert] was promoted to the rank of Captain, and Charette was appointed Acting Police Chief.  Defendant Jebb, also a candidate for Acting Police Chief, allegedly resented Charette and other police officers, including [Gilbert], who he believed had supported Charette's appointment.

That same year, certain Chicopee Police Officers responding to a murder scene took pictures of the victim's body and shared them with one another and with civilians outside the police department in violation of department regulations.  At the time, Defendant Jebb was the Internal Affairs Investigative Officer tasked with investigating this incident.  Jebb concluded that only one officer was responsible for the improper conduct, and he failed to recommend, in [Gilbert]'s view, a sufficiently stringent sanction.

At some point in the 2012-2013 time frame, the investigation into the murder scene misconduct by Chicopee Police Officers resumed.  This time the inquiry included an incident where photographs of the murder victim's corpse were allegedly displayed to civilians outside the police department at a football game.

In May 2013, Jebb was relieved of his duties with Internal Affairs, and he himself became a target of an investigation into his conduct as the Internal Affairs Investigative Officer.  This second investigation focused, in part, on allegations that Jebb failed to look into sexual harassment charges against several officers. It also looked into whether Jebb had properly

investigated the officers who had distributed the gruesome photographs from the murder scene.

Jebb had made an unsuccessful bid for the office of President of the Police Union in 2013, and the complaint refers to an allegation that he improperly numbered the ballots in that election in order to be able to identify which officers supported him and which supported his opponent, Sgt. Dan Major. Finally, [] Jebb was also accused of hiding evidence to thwart an internal investigation into allegations that Sgt. Major had choked a prisoner.[3]

> [3]"[Gilbert]'s complaint implies that these charges formed part of the investigation(s) then pending against Jebb and not merely allegations on [Gilbert]'s part offered in this litigation. (Dkt. No. 72 at 3-4). Although the complaint is ambiguous on this point,[] Jebb and Kos's Memoranda in support of their Motions to Dismiss clarify the context to some extent. Jebb's Memorandum notes that [Gilbert] made "written statements and testimony . . . to a government investigator relating to Jebb's alleged mishandling of ballots." (Dkt. No. 28 at 1). Kos's Memorandum observes that [Gilbert], "as a police captain and internal affairs investigator had investigated Chief Jebb's removal of evidence from the booking room."

[Gilbert] had been the investigating officer for the Major investigation, and he had recommended no discipline be taken against Sgt. Major . . . . [Gilbert] characterizes his participation in the ongoing investigations to include "provid[ing] information and participat[ing] in activity which focused on Police Chief William Jebb's conduct and practices of implementing less than proper discipline towards his friends and retaliating against those he was not friends with; and those who did not vote for him to be the Union President." (Dkt. No. 67-2 at 1).

In July 2013, then-Acting Police Chief Charette asked [Gilbert] to draft and file a written incident report about the episode six years earlier when [] Pronovost had threatened [Gilbert] with his gun.

[Gilbert] did so. The report was technically late, in violation of Department policy, but Charette did not discipline [Gilbert], as [Gilbert] had verbally reported the incident to Charette and another of his immediate supervisors at the time it occurred.

According to [Gilbert], [] Jebb was unhappy with [Gilbert]'s participation in the ongoing investigation of the gun incident and possibly other incidents. On October 15, 2013, [Gilbert] received a phone call from [] Jebb in which the latter told him, "You have no idea about internal affairs, but you are going to learn. I am definitely without a doubt going to win my appeal [regarding his having been passed over for Acting Chief] and when I do, your [sic] fucked." (Dkt. No. 67-3 at 1).

In 2014, [] Mayor Kos appointed [] Jebb as Police Chief. [Gilbert] alleges that thereafter Jebb "began changing [Gilbert's] terms and conditions of employment and engaged in a concerted effort to have criminal charges initiated against [him]." (Dkt. No. 72 at 9). [Gilbert] claims [] Jebb ordered him off all of his overtime details, citing as a reason [Gilbert]'s filing of a false police report in regard to the 2007 gun incident. [He] claims that [] Jebb repeatedly "initiat[ed] pretextual discipline" against him, but he does not provide details or state when this occurred. In any event, the [amended] complaint specifies no disciplinary sanctions resulting from these proceedings.

Around this time, according to the complaint, [] Jebb met with [] Kos and Pronovost as part of a conspiracy to bring retaliatory criminal charges against [Gilbert] and Charette. Charges were eventually brought against [Gilbert] in Holyoke District Court, perhaps for filing a False Police Report. It is difficult to tell from the amended complaint, which does not provide a date these charges were brought, what exactly those charges were, or how the criminal case resolved. Count 4 in the amended complaint states that [Gilbert] was charged with Filing a False Police, which presumably is the criminal case [Gilbert] is referring to. Additionally, Gilbert states that the "process terminated in [his] favor," (Dkt. No. 72 at 17), though it is not clear if that means he was acquitted of the charge after a trial or the charge was dropped.

- 7 -

Gilbert, 2017 WL 8730474 at *1-3.

**WHAT HAPPENED IN THE DISTRICT COURT**

Gilbert filed his federal complaint on February 4, 2016, to which the defendants responded with Rule 12(b)(6) motions to dismiss. Gilbert then sought leave to amend the complaint, which the district court allowed on March 7, 2017 (but struck the proposed amended complaint due to its "extreme sloppiness"). Three days later, Gilbert filed the operative amended complaint (which we refer to herein as "the complaint") in which he asserted eight counts:

- Count 1: a claim under 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11H against all defendants individually for retaliating against him for exercising his First Amendment rights to speak on a matter of public concern and for due process rights violations;[3]

- Count 2: a claim under 42 U.S.C. § 1983 against the City for maintaining policies and customs that resulted in the violation of Gilbert's First Amendment rights;

- Count 3: a claim under Mass. Gen. Laws ch. 149, § 185 (the Massachusetts whistleblower statute) against the City,

---

[3] In Count 1 of his complaint, Gilbert conclusorily states, "The Defendants acting under the color of state law violated the Plaintiff's due process rights . . . ." He does not allege anything further and his brief is completely silent as to this claim. We thus deem any due process arguments waived.

- 8 -

Police Chief Jebb, and Mayor Kos for taking retaliatory actions against Gilbert;

- Counts 4 through 8: common law claims against all defendants individually for Abuse of Process, Defamation, Intentional Infliction of Emotional Distress, Malicious Prosecution, and Civil Conspiracy.

In due course, the defendants renewed their dismissal motions, which the district court ultimately granted.[4] In considering Gilbert's Count 1 First Amendment claim which got tossed with prejudice as to all defendants, the district court struggled to identify the exact speech Gilbert alleged to be protected: "This is not a case where Plaintiff wrote a letter or spoke out at a public meeting. Exactly what Plaintiff said, and when, is left very vague." Gilbert, 2017 WL 8730474 at *5. But after generously combing through the complaint, the district court determined that the speech Gilbert most emphasized as warranting First Amendment protections was the July 19, 2013 written report, in which he described the 2007 gun-pointing incident involving Pronovost and Gilbert. And to the extent the July report was the "speech" in question, the district court reasoned it was offered pursuant to Gilbert's official duties as a police officer and

---

[4] In so holding, the district court dismissed all claims against John Doe and Jane Doe with prejudice since those defendants were not named anywhere in the body of the amended complaint.

public employee, and not as a private citizen, and, therefore, not afforded First Amendment protections.

The district court also dismissed with prejudice Count 2's municipal liability claim. To succeed on this claim Gilbert had to "offer sufficient facts to permit the court to identify an unconstitutional custom or policy of the city that was the moving force behind the injury alleged." Gilbert, 2017 WL 8730474 at *6 (quoting Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011)) (citation and internal quotation marks omitted). The district court found that although the complaint conveyed Gilbert's sense of grievance about general misconduct at the police department it failed to "articulate a specific municipal custom or policy[] or to offer concrete allegations demonstrating its existence." Id.

After rejecting Gilbert's federal claims, the district court declined to exercise supplemental jurisdiction over Counts 3 through 8 state law claims save the ones involving Kos: those got dismissed with prejudice. As to them, the district court found that Gilbert either complained about events which occurred before Kos was elected mayor or made conjectural and speculative allegations devoid of any facts which could support a viable cause of action.

And here we are.

- 10 -

## STANDARD OF REVIEW

We review the district court's ruling on a motion to dismiss de novo, accepting all well-pled facts in the complaint as true, and drawing all reasonable inferences in favor of the plaintiff. Ocasio-Hernández, 640 F.3d at 7; Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). To survive a motion to dismiss under Rule 12(b)(6), the complaint must give the defendant fair notice of what the claim is and the ground upon which it rests and allege a plausible entitlement to relief. Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011). Dismissal for failure to state a claim is warranted when the complaint lacks "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). We make this determination through a holistic, context-specific analysis of the complaint. See Iqbal, 556 U.S. at 679; Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). Nevertheless, the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

Also relevant here (in part) is this: when the district court "accurately takes the measure of a case, persuasively explains its reasoning, and reaches a correct result, it serves no useful purpose for a reviewing court to write at length in placing

its seal of approval on the decision below." Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013).

With these standards in mind, we turn to the limited issues presented on appeal. Did the district court blunder, as Gilbert contends, in dismissing Count 1 against Kos, Jebb, and Pronovost, Count 2 against the City, and most of the state law claims against Kos?[5]

**ANALYSIS**[6]

1. *First Amendment Retaliation Claim*

We begin our analysis with Gilbert's claim that "[t]he Defendants acting under the color of state law violated and

---

[5] Gilbert is not appealing the dismissal of Count 5.

[6] Pronovost argues that we have no jurisdiction to review the district court's November 14, 2017 order granting the defendants' motions to dismiss because Gilbert's notice of appeal is defective, in violation of Federal Rule of Appellate Procedure 3(c)(1)(B). True, Gilbert's notice of appeal stated that he appealed from Docket #86, which is the district court judge's Memorandum and Order, instead of Docket #87, which is the Order of Dismissal. We reject Pronovost's contention. That Gilbert mixed up the dismissal order's docket number is of no matter in this instance because "[a] mistake in designating a judgment . . . in the notice of appeal ordinarily will not result in loss of the appeal as long as the intent to appeal a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake." In re Spookyworld, Inc., 346 F.3d 1, 6 (1st Cir. 2003) (quoting Kelly v. United States, 780 F.2d 94, 96 n.3 (1st Cir. 1986)). Here, Gilbert's intent is unambiguous. From the face of the notice of appeal, Gilbert specified that he sought to appeal "from the District Court's Order entered November 14, 2017 . . . allowing Defendants' Motion to Dismiss and dismissing Plaintiff's Complaint." Thus, we conclude that we have jurisdiction to review the district court's dismissal order.

retaliated against the Plaintiff for exercising his First Amendment rights and in retaliation for speaking out and participating in a government investigation."  As Gilbert tells it, he was removed from working all overtime hours, subjected to a criminal proceeding, and suspended from the police department in retaliation for voicing his protected speech.

But before diving into the merits, we pause to again note our agreement with the district court's observation:  our de novo review of Gilbert's First Amendment claim is handcuffed by the lack of specificity regarding exactly what speech underlies his claim.  Gilbert's complaint muddlingly sketches a litany of occasions spanning years during which he griped to superiors and investigators, orally and in writing, about the professional behavior of his colleagues or public officials.  Through their briefing the appellees give us a clue as to their understanding of Gilbert's complaint.  For their part, the City, Jebb, Kos, and Pronovost suggest that they, like the district court, understand Gilbert's most significant at-issue speech to refer to the July 2013 written report of Pronovost misusing his firearm.  However, whether we view Gilbert's complaint as encompassing one or multiple events of speaking out, the result is the same.  He fails to state a First Amendment claim.

In general, government officials may not subject "an individual to retaliatory actions . . . for speaking out."

Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25 (1st Cir. 2010) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). This is so because "[p]ublic employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees." Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 765 (1st Cir. 2010) (quoting Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007)). However, "in recognition of the government's interest in running an effective workplace," those rights are not absolute. Decotiis, 635 F.3d at 29 (quoting Mercado-Berrios, 611 F.2d at 26); see also Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).

To determine whether an adverse employment action against a public employee violated an individual's First Amendment free speech rights, we employ a three-part inquiry. See Rodriguez-Garcia, 610 F.3d at 765-66. First, we must assess whether Gilbert "spoke as a citizen on a matter of public concern." Curran, 509 F.3d at 45 (quoting Garcetti, 547 U.S. at 418). In making this determination, we ask whether the "speech" underlying Gilbert's claim was made "pursuant to his official duties." Garcetti, 547 U.S. at 421. In considering this question, we look to several "non-exclusive factors," which help distinguish speech by a public employee in a professional versus a private capacity. These include:

whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

Decotiis, 635 F.3d at 32 (internal citations omitted). If we conclude, as we do, after applying these factors, that Gilbert's speech was made "pursuant to his official duties," then Gilbert has no First Amendment claim, since, generally, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties." Garcetti, 547 U.S. at 421-22.[7]

Because Gilbert's claim founders at the first prong of the Garcetti inquiry -- that is, whether Gilbert "spoke as a

---

[7] Had we concluded that Gilbert made the speech in his private capacity, then we would have proceeded to the second requirement and balanced Gilbert's interest in speaking as a private citizen regarding matters of public concern with the interest of the government, as an employer, in promoting the efficiency of the public services it performs. See Decotiis, 635 F.3d at 29 (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). Then under the third requirement, Gilbert would have to have shown that the speech was a substantial or motivating factor in the adverse employment decision. See Curran, 509 F.3d at 45. If all three parts of the inquiry had been resolved in Gilbert's favor, the defendants could still escape liability if they had shown the same decision would have been reached even absent the protected conduct. Rodriguez-Garcia, 610 F.3d at 765-66 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

citizen on a matter of public concern" -- we decline to reach the second and third prongs.

As to Gilbert's federal constitutional claim, it is premised solely on his assertion that his speech involved matters of public concern and thus enjoys First Amendment protections. According to him "[i]t is in the interest of the police department, and the general public, to ensure that officers take considerable care in how they handle their service weapons." And of public concern is "the failure to properly address police misconduct, which has the potential to impact the larger public." Gilbert continues -- failing to "investigate sexual harassment complaints," exuding "leniency in investigating officers who distributed photographs" of a corpse, and removing evidence from an evidence room "for the purpose of interfering with an IIU investigation" would also rise to the level of creating a public concern for the citizens of Chicopee.

In response, the appellees argue that the district court got it just right: it properly dismissed Gilbert's First Amendment claim because all of Gilbert's speech was compelled as part of his employment and thus was made within the scope of his official duties rather than as a citizen.[8] We agree.

_____

[8] In his brief, Gilbert tells us that the Decotiis factors which we enumerated above are the analytical tools we must use to determine whether Gilbert spoke in his capacity as a citizen or

- 16 -

Applying the Decotiis factors spelled out above, there is no plausible inference which can be drawn from the complaint that Gilbert's statements were made in his capacity as a citizen.

Explicating first on the July 2013 report, Gilbert acknowledges in the complaint that he wrote the report in response to an "order," and that he "would have been disciplined for refusing to follow a command if he refused" to write the report. He makes clear that he "did not initiate the subject complaints against Defendant Jebb . . . [and that the] City of Chicopee, through its executive [i.e., Charette], created this issue by ordering [Gilbert] to provide a summary of these events again to management." Further, the subject matter about which he spoke concerned the gun incident and Pronovost's conduct "in the work place" -- that is, bringing crystal rocks and setting up "ghost traps" in the booking area and cells of inmates at the police station. The content of the July report also includes a discussion about another work colleague -- Jebb -- whom Gilbert told about the incident and allegedly failed to properly discipline

_____

pursuant to his official duties. And his brief is replete with why his words should be deemed of public concern. Yet Gilbert never bothers either in his initial brief or reply brief to provide us with any reasoned explanation for why we should deem his speech that of a private citizen under the Decotiis test. Therefore, his argument is likely waived. Fernandez-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 327 (1st Cir. 2015) (citing U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)); McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991). Regardless, it lacks merit.

- 17 -

Pronovost. Gilbert derived this information from the special knowledge obtained during the course of his employment. The parties involved in the gun incident were two work colleagues -- that is, Pronovost and Gilbert. And, although Gilbert does not specify where precisely this confrontation occurred, inferentially from the complaint, it happened at work. Additionally, his speech was made up the chain of command, in Gilbert's words, "to management." After Charette, "an executive" as Gilbert tells us, ordered him to draft the report, it was then turned over to the investigator, hired by the City, who requested any and all documentation related to Jebb's conduct. This type of communication -- complaints or concerns made up the chain of command -- is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment. See, e.g., Decotiis v. Whittemore, 635 F.3d at 32 (suggesting that speech an employee is "authorized or instructed to make" is "made pursuant to [his] job duties in the most literal sense") (citations omitted); see also Kimmett v. Corbett, 554 F. App'x 106, 112 (3d Cir. 2014); Hagen v. City of Eugene, 736 F.3d 1251, 1258 (9th Cir. 2013); Davis v. McKinney, 518 F.3d 304, 315-16 (5th Cir. 2008). Moreover, nowhere in his complaint does Gilbert assert or even suggest that he spoke publicly about this report. On the contrary, this particular statement Gilbert uttered concerning the gun-

pointing incident was communicated, either in accordance with police department procedure or because of police department directive, solely internally.

As for Gilbert's other instances of speech involving his grievances against fellow officers or public officials, because it is clear from his complaint that they arose in essentially the same police department internal affairs context, the reasoning is the same. Therefore, we are looking at quintessential employment-related speech made pursuant to official duties. See O'Connell v. Marrero-Recio, 724 F.3d 117, 123 (1st Cir. 2013) (noting that speech solely focused on workplace events and made to fulfill work responsibilities is "the quintessential example of speech that owes its existence to a public employee's professional responsibilities and thus is not protected under the First Amendment"). As such, Gilbert is unable to state a plausible claim for relief that he spoke as a citizen regarding matters of public concern rather than as an employee simply carrying out his job-related responsibilities. Our First Amendment inquiry ends there.[9]

---

[9] The City and Kos also argue (anticipatorily) that, to the extent Gilbert is attempting to liken this case to Lane v. Franks, 573 U.S. 228 (2014), his argument fails. As the City and Kos tell us, the Supreme Court held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes . . . even when the testimony relates to his public employment or concerns information learned during that employment." Lane, 573 U.S. at 238. According to Kos and the City, because Gilbert does not

- 19 -

## 2.  *Municipal Liability Claim*

To make out a municipal liability claim, Gilbert would have to first prove a viable First Amendment retaliation claim, satisfying Garcetti's three-part inquiry.  But because we conclude that no constitutional injury was inflicted, it is unnecessary to consider Gilbert's municipal liability claim.  See Evans v. Avery, 100 F.3d 1033, 1039 (1st Cir. 1996) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)); see, e.g., Wagner v. Devine, 122 F.3d 53, 57 (1st Cir. 1997).

## 3.  *State Law Claims Against Kos*

Gilbert argues that the district court erred in dismissing the state law claims against Kos.[10]  He says that his complaint "pled plausible and sufficient facts against Defendant Kos . . . as to his abuse of process claim[] (Count 4), intentional infliction of emotional distress claim (Count 6), malicious

---

allege that he testified under oath pursuant to a subpoena, Lane does not aid his cause.  They also contend that Gilbert is unlike the plaintiff in Lane because sworn testimony, as opposed to internal reporting within the walls of a public employer, has a citizen element.  Given that Gilbert never mentions Lane in his opening brief, even though the district court addressed it in its Memorandum and Order Regarding Defendants' Motions to Dismiss, and since even in his reply brief, he never explains why he is similarly situated to Lane, we need say no more.

[10] Gilbert does not challenge the district court's exercise of discretion in deciding to rule on the merits of his state law claims against Kos.  He thus waives any argument that the district court abused its discretion.

- 20 -

prosecution claim (Count 7), and civil conspiracy claim[] (Count 8)[.]"  We disagree.

Gilbert mentions Kos only in a handful of places when pleading the facts in the complaint, and when he does, it is, to describe it charitably, skimpy.  For example, Gilbert nakedly asserts that Kos "acquiesced to Defendant Jebb's conduct," but he does not flesh out how (or when or where) he did so.  Likewise, Gilbert asserts that after Kos "appointed Defendant Jebb to Police Chief, the Defendants jointly engaged in conduct attempting to command a voluntary separation of employment by the Plaintiff with the City of Chicopee" but he alleged no detailed facts that would enable a court to draw the reasonable inference that Kos was liable for the misconduct alleged.  To boot, as the district court noted, much of the complaint refers to events that occurred before Kos became Chicopee's mayor.  For these reasons, the state law claims against Kos were properly dismissed.  Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 293-94 (1st Cir. 1995); see also Agema v. City of Allegan, 826 F.3d 326, 332-33 (6th Cir. 2016); Santiago v. Warminster Twp., 629 F.3d 121, 131 (3d Cir. 2010); McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997).

## CONCLUSION

We **affirm**[11] and award costs to appellees. Over and out.

---

[11] Because we conclude Gilbert's claims fail to survive Rule 12(b)(6) muster, we need not address appellees' alternative theories of defense.