Charles N. **BENNER,** on behalf of himself and all others similarly situated, Plaintiff,

v.

**BANK OF AMERICA, N.A., et al., Defendants.**

**Civil Action No. 11–6574.**

United States District Court, E.D. Pennsylvania.

Jan. 7, 2013.

Noah I. Axler Donavan Axler, LLC, Irv Ackelsberg Langer Grogan & Diver PC, Philadelphia, PA, for Plaintiff.

Andrew J. Soven, Marc A. Goldich, Reed Smith LLP, Philadelphia, PA, for Defendants.

## OPINION

SLOMSKY, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION ...............................................343

II. FACTUAL BACKGROUND .........................................345
 A. Plaintiff's Mortgage ...................................345
 B. Defendant's Loan Servicing Practices ...................346
 C. Defendant's Pre–Foreclosure Notices ...................347
 D. Defendant's Monthly Mortgage Statement and Loan Modification Offer.....348
 E. Plaintiff's Requests for Mortgage Information ..........348

III. LEGAL STANDARD FOR MOTION TO DISMISS .......................349

IV. DISCUSSION .................................................350
 A. Legality of Property Inspection Fees ..................350
 1. Fair Debt Collection Practices Act, 15 U.S.C. § 1692e and § 1692f.....350
 a. Pre–Foreclosure Notices and Mortgage Statement—§ 1692e .......351
 b. Loan Servicing Practices—§ 1692f ................354
 2. Loan Interest and Protection Law, 41 Pa. Cons.Stat. § 101 ............356
 3. Fair Credit Extension Uniformity Act, 73 Pa. Cons.Stat. § 2270.1.....359
 4. Unjust Enrichment ..................................360
 B. Sufficiency of Pre–Foreclosure Notices Pursuant to Pennsylvania
 Foreclosure Prevention Act and 15 U.S.C. § 1692 .....................361
 C. Adequacy of Responses to Qualified Written Requests Under Real
 Estate Settlement Procedures Act, 12 U.S.C. § 2605(e) ................362

V. CONCLUSION .................................................365

## I. INTRODUCTION

Plaintiff Charles Benner is a residential homeowner in Pennsylvania. His mortgage is serviced by Defendant Bank of America.[1] Under the mortgage agreement, Defendant is permitted to charge Plaintiff for certain services if he defaults on his mortgage. In 2009, Plaintiff defaulted and Defendant began performing monthly property inspections in accordance with the terms of the mortgage. In late 2010, Defendant sent a notice to Plaintiff, as required by Pennsylvania law, of its intention to initiate foreclosure proceedings. The pre-foreclosure notice listed the specific amounts that Plaintiff was required to pay to cure his default. Included among them was a fee of $262.50 for the property inspections. Plaintiff did not pay this fee, nor was his home foreclosed upon, but he contends in this case that the inspections were unnecessary and therefore Defen-dant's request for payment violated four federal and state laws. In addition, Plaintiff makes claims against Defendant for conduct unrelated to the property inspection fees.

First, regarding the property inspection fees, Plaintiff contends that the request for payment of these fees violated provisions of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e and § 1692f. Section 1692e prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," which includes "false representation of . . . the character, amount, or legal status of any debt." Section 1692f provides that "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) [is prohibited] unless such amount is expressly

---

**1.** The Amended Complaint names both Bank of America, N.A. and BAC Home Loans Servicing, L.P. as Defendants. (Doc. No. 14.) At all relevant times, BAC Home Loans Servicing, L.P. has been wholly-owned by Bank of America, N.A. (*Id.* ¶ 12.) Thus, the Court will refer to both Defendants collectively as "Defendant Bank of America" or "Defendant."

authorized by the agreement creating the debt or permitted by law." Plaintiff alleges that false representations regarding property inspection fees were made by Defendant in violation of the FDCPA when this Act is considered in conjunction with another statute, the Pennsylvania Loan Interest and Protection Law (also known as "Act 6").

Act 6, which is the second law Plaintiff contends was violated, required Defendant to send Plaintiff a written notice of its intention to foreclose on his property. The notice had to inform him of his "right ... to cure the default ... and exactly what performance including what sum of money, if any, must be tendered." 41 Pa. Stat. § 403(c)(3). Furthermore, Act 6, among other things, limits the sum of money that can be demanded to "the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment." *Id.* § 404(b)(3). Plaintiff contends that Defendant's property inspection fees were unnecessary and thus not "reasonable costs of proceeding to foreclosure" or even permitted by the mortgage agreement.[2] Given the specific terms of Act 6, Plaintiff claims that Defendant falsely stated the amount of Plaintiff's debt in the pre-foreclosure notice in violation of § 1692e and § 1692f.

Next, Plaintiff contends that Defendant's conduct regarding the inspection fees also violated the Pennsylvania Fair Credit Extension Uniformity Act, the third law allegedly violated by Defendant. This Act states that "[i]t shall constitute an unfair or deceptive debt collection act or practice under this act if a debt collector violates any of the provisions of the [FDCPA]." 73 Pa. Stat. § 2270.4.

Finally, Plaintiff brings a Pennsylvania common law claim for unjust enrichment, again based on Defendant's attempted collection of the property inspection fees.

Plaintiff also asserts an FDCPA claim against Defendant for conduct unrelated to the property inspection fees. The Pennsylvania Foreclosure Prevention Act (also known as "Act 91") required Defendant's pre-foreclosure notices to include information on how to apply for the Homeowner's Emergency Mortgage Assistance Program ("HEMAP"). 35 Pa. Stat. § 1680.403c(b)(1). Specifically, Defendant was required to advise Plaintiff as the debtor that he had "thirty (30) days, plus (3) days for mailing, to have a face-to-face meeting with a consumer credit counseling agency to attempt to resolve the delinquency or default," *id.*, and that an "application for mortgage assistance [could] be submitted to [HEMAP] beyond the thirty (30)-day period." *Id.* § 1680.403c(b)(7). Plaintiff contends that Defendant violated § 1692e of the FDCPA by sending pre-foreclosure notices that contained false or misleading information about how and when he could exercise his HEMAP rights under Act 91.

Lastly, Plaintiff argues that Defendant violated federal law by failing to provide adequate responses to his multiple written requests for mortgage information. The Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e), imposes a duty on loan servicers to respond to borrowers' inquiries within a certain time frame. Section 2605(e)(1)(A) states that "the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days." Additionally, § 2605(e)(2) requires servicers—"[n]ot later than 60 days ... after the receipt from any borrower of any qualified written re-

---

2. The loan agreement, however, permits Defendant to charge for property inspections

"for the purpose of protecting [its] interest in the Property." (Doc. No. 14 ¶ 28.)

quest"—to provide borrowers with the information requested or a written explanation of why the information is unavailable.

In early 2011, several months after receiving the pre-foreclosure notices, Plaintiff wrote to Defendant for information about a loan modification offer made by Defendant and the method used to calculate the amount of his default. Defendant responded at different times, from different offices, and allegedly never provided the information requested. Thus, Plaintiff contends that Defendant also violated the requirements of RESPA.

On October 20, 2011, Plaintiff filed this lawsuit.[3] Presently before the Court is Defendant's Motion to Dismiss Counts I through VI of the Amended Complaint (Doc. No. 16) for failure to state a claim

upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[4] For reasons that follow, Defendant's Motion to Dismiss will be granted on Counts I through V and will be denied on Count VI.[5]

## II. FACTUAL BACKGROUND

The following facts are drawn from the Amended Complaint, items of public record, and other documents integral to the claims.[6]

### A. Plaintiff's Mortgage

In 2002, Plaintiff Charles Benner borrowed $147,000 to buy a home in Northeast Philadelphia. (Doc. No. 14 ¶ 46.) A mortgage was placed on his home which he

---

3. On December 22, 2011, Plaintiff amended the Complaint. (Doc. No. 14.) The Amended Complaint alleges the following:

- Count I—FDCPA, 15 U.S.C. § 1692e(2) and § 1692f(1), for charging the property inspection fees
- Count II—FDCPA, 15 U.S.C. § 1692e, for improper Pennsylvania pre-foreclosure notices
- Count III—Fair Credit Extension Uniformity Act, 73 Pa. Stat. § 2270.1 et seq., for FDCPA violations
- Count IV—Pennsylvania Loan Interest and Protection Law, 41 Pa. Stat. § 101 et seq., for charging the property inspection fees
- Count V—Unjust enrichment
- Count VI—Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), for insufficient responses to mortgage loan information requests
- Count VII—Fair Credit Reporting Act, 15 U.S.C. § 1681s–2(b), for providing negative reports to credit bureaus
- Count VIII—15 U.S.C. § 1692c(a)(2), c(c), d(5), for continually contacting Plaintiff after learning he was represented by an attorney

4. In the Motion to Dismiss, Defendant is not challenging the sufficiency of the claims made in Counts VII and VIII. As such, the Court will not recite facts and law relevant to those counts.

5. In deciding this motion, the Court has considered the following: Defendant's Motion to Dismiss (Doc. No. 16); Plaintiff's Response in Opposition (Doc. No. 22); Defendant's Reply (Doc. No. 24); arguments of counsel at the March 13, 2012 hearing; Plaintiff's Supplemental Memorandum in Opposition (Doc. No. 28); Defendant's Reply (Doc. No. 31); Defendant's Notice of Supplemental Authority in Support of Motion to Dismiss (Doc. No. 32); and Plaintiff's Response (Doc. No. 33).

6. In deciding a motion to dismiss, a court may consider "documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir.2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed.2004)). Additionally, "'a court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *Dougherty v. Wells Fargo Home Loans, Inc.*, 425 F.Supp.2d 599, 602–03 (E.D.Pa.2006) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993)).

refinanced in July 2006 with Allied Mortgage Group, a Pennsylvania lender. (*Id.* ¶¶ 47–48, Ex. A.) The mortgage contained numerous covenants, including the following relevant clauses:

> 7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.... Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.
>
> 14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorney's fees, property inspection and valuation fees.

(*Id.* ¶ 28.) Allied Mortgage Group later sold the mortgage to another lender, and Wilshire Credit Corporation began servicing the loan. (*Id.* ¶ 50.)

During 2009, Plaintiff fell behind on his mortgage payments. (*Id.* ¶ 51.) After the default, Wilshire Credit offered him the opportunity to modify his mortgage payments through its "Home Affordable Modification Trial Period Plan." (*Id.* ¶ 53, Ex. B.) The Plan included a three month trial period. This period was to begin on January 1, 2010. The Plan required Plaintiff to take certain steps to implement the modification. (*Id.*) Plaintiff accepted Wilshire Credit's offer on December 27, 2009, and thereafter made monthly payments at a reduced rate. (*Id.* ¶ 54, Ex. B.)

On February 1, 2010, Defendant Bank of America notified Plaintiff that it was replacing Wilshire Credit as the servicer of the mortgage. (*Id.* ¶ 58; Doc. No. 16, Ex. B.) Defendant's notice provided, among other things, information about its status as a "debt collector," a new address where Plaintiff should send his mortgage payments, and details on how to exercise his rights under the Real Estate Settlement Procedures Act ("RESPA"). (Doc. No. 16, Ex. B.) The RESPA information contained the following definition and condition:

> A "qualified written request" is a written correspondence ... which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding BAC Home Loans' servicing of your loan, it must be sent to the following address:
>
> BAC Home Loans
> Customer Service Correspondence CA6–919–01–41
> P.O. Box 5170
> Simi Valley, CA 93062–5170

(*Id.*) After receiving this notice, Plaintiff began sending his reduced monthly payments to Defendant. (Doc. No. 14 ¶ 58.)

**B. *Defendant's Loan Servicing Practices***

Defendant services residential mortgages nationwide. (*Id.* ¶ 1.) As a loan servicer, it acts as an agent for the owner of the loan. (*Id.* ¶ 15.) Defendant is responsible for billing borrowers and collecting principal and interest payments. (*Id.* ¶ 16.) When a borrower defaults on his mortgage payments, Defendant makes the decision whether to initiate foreclosure or to offer a

loan modification. (*Id.* ¶ 17.) Defendant can seek reimbursement from borrowers of costs incurred to ensure property is not deteriorating or being destroyed or that arise from the foreclosure proceedings. (*Id.* ¶¶ 16, 26.) For example, property inspections can be made. (*Id.* ¶ 26.) The charge for an inspection is $ 15 per month for borrowers in default. (*Id.* ¶ 81.)

On June 7, 2010, the Federal Trade Commission ("FTC") filed a Complaint in the Central District of California alleging that Defendant [7] violated the FTC Act by charging borrowers for "default services, such as property inspections and title reports, that in some instances were not reasonable and appropriate" under the mortgage agreement. (*Id.* ¶ 87; Doc. No. 22–2 ¶¶ 1, 12, 17.) Approximately one week later, the FTC and Defendant filed a Consent Judgment and Order in which Defendant agreed to, among other things, not assess or collect "any Fee for a Default–Related Service unless it is a reasonable Fee charged . . . for a Default–Related Service that is actually performed." [8] (Doc. No. 14 ¶ 88; Doc. No. 22–3 at 8.)

### C. *Defendant's Pre–Foreclosure Notices*

Defendant charged Plaintiff for default-related services. On November 8, 2010, approximately nine months after Defendant began servicing Plaintiff's mortgage, it sent him a letter with the following caption in large, bold letters across the top:

ACT 91 NOTICE

TAKE ACTION TO SAVE

YOUR HOME FROM

FORECLOSURE

(Doc. No. 14 ¶ 60, Ex. C.) The Act 91 Notice, which contained Defendant's logo and payment stub, advised Plaintiff "that the mortgage on [his] home is in default, and the lender intends to foreclose." (*Id.*) Plaintiff was informed that proceedings would commence unless he: (1) applied for assistance with the Homeowner's Emergency Mortgage Assistance Program (HEMAP) or (2) "cure[d] the default within thirty (30) days of the date of this notice by paying the total amount past due to the lender, which is $27,184.02 plus any mortgage payments and late charges which become due during the thirty (30) day period." (*Id.*) The total amount due was comprised of monthly charges, late charges, and a $262.50 charge listed as "INSPECTION–OCCUPIED." (*Id.*)

The Act 91 Notice provided Mr. Benner with the following instructions on HEMAP:

> To see if HEMAP can help, you must MEET WITH A CONSUMER CREDIT COUNSELING AGENCY WITHIN 30 DAYS OF THE DATE OF THIS NOTICE.

> Under the Act, you are entitled to a temporary stay of foreclosure on your mortgage for Thirty (30) days from the date of this Notice. During that time you must arrange and attend a "face-to-face" meeting with one of the consumer credit counseling agencies listed at the end of this Notice. THIS MEETING MUST OCCUR WITHIN THE NEXT THIRTY (30) DAYS. IF YOU DO NOT

---

7. The FTC's Complaint named Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP as defendants. (Doc. No. 22–2.) Bank of America acquired both defendants during the relevant time frame, and therefore the FTC's action also implicated Bank of America. (*See id.* ¶¶ 12–13.) The Complaint did not, however, specifically allege that Bank of America participated in any wrongful conduct. (*Id.* ¶ 4.)

8. The Consent Judgment and Order were not an admission of wrongdoing. (Doc. No. 22–3 at 8.)

APPLY FOR EMERGENCY MORT-GAGE ASSISTANCE, YOU MUST BRING YOUR MORTGAGE UP TO DATE.

If you meet with one of the consumer credit counseling agencies listed at the end of this notice, the lender may NOT take action against you for Thirty (30) days after the date of this meeting.

If you have tried and are unable to resolve this problem with the lender, you have the right to apply for financial assistance from the Homeowner's Emergency Mortgage Assistance Program. To do so, you must fill out, sign and file a completed Homeowner's Emergency Assistance Program Application with one of the designated consumer credit counseling agencies listed at the end of this Notice.... Your application MUST be filed or postmarked within Thirty (30) days of your face-to-face meeting.

YOU MUST FILE YOUR APPLICA-TION PROMPTLY. IF YOU FAIL TO DO SO OR IF YOU DO NOT FOLLOW THE OTHER TIME PERIODS SET FORTH FN THIS LETTER, FORE-CLOSURE MAY PROCEED AGAINST YOUR HOME IMMEDI-ATELY AND YOUR APPLICATION FOR MORTGAGE ASSISTANCE WILL BE DENIED.

(*Id.* Ex. C.) On December 16, 2010, Defendant sent a second, nearly identical Act 91 Notice to Plaintiff, the main difference being an adjustment for December's monthly charges. (*Id.* ¶ 61, Ex. D.)

### D. *Defendant's Monthly Mortgage Statement and Loan Modification Offer*

On January 4, 2011, Plaintiff received his monthly mortgage bill from Defendant. (*Id.* ¶ 68, Ex. J.) The bill stated that Plaintiff's account remained "seriously delin-quent." (*Id.*) Included on the bill was the following statement:

> As long as your loan remains delinquent, [Defendant] will conduct inspections of your property on a periodic basis. These inspections are provided for in your loan documents. [Defendant] will inspect your property to confirm occupancy, identify the occupants, and observe the physical condition of the property. You are responsible for paying the costs of these inspections.

(*Id.*) Defendant also continued to demand payment for the previously assessed $262.50 property inspection fee. (*Id.*)

Three weeks later, without explanation, Defendant's Home Retention Division, located in Pittsburgh, Pennsylvania, sent Plaintiff a letter informing him that his loan modification had been approved. (*Id.* ¶ 62, Ex. E.) The "Field Inspection Fees" were still listed at $262.50. (*Id.*) The letter provided details on a new monthly payment, and also advised that it would not be effective until Plaintiff took certain steps. (*Id.*)

### E. *Plaintiffs Requests for Mortgage Information*

Plaintiff rejected the loan modification offer in a letter dated February 4, 2011. (*Id.* ¶ 63, Ex. F.) The letter was addressed to Defendant's Home Retention Division in Pittsburgh, the same division and location that sent the loan modification offer. (*Id.*) He wrote that "[b]ased on [his] prior full compliance with a trial plan agreement, [he] should have been given a modification under the federal Home Affordable Modification Program ('HAMP')." (*Id.*) Plaintiff requested more detailed information on the modification program Defendant was using to make its offer, as well why the offer was being limited to a variable—as opposed to fixed—interest rate modification of the amount of the mortgage. (*Id.*)

While awaiting a response, Plaintiff filed an application on February 10, 2011 for emergency mortgage assistance with the Pennsylvania Housing Finance Agency ("PHFA"). (Doc. No. 16, Ex. C.) PHFA notified Defendant of the application; informed Defendant that it was prohibited under Pennsylvania law from commencing foreclosure proceedings until a decision was made on the application; and advised that it would decide eligibility for the program within sixty days. (*Id.*)

Since Defendant had not responded to Plaintiffs February 4th letter, he sent a second request to the same Pittsburgh location in a letter dated March 11, 2011. (*Id.* ¶ 64, Ex. G.) In addition to making the same requests, Plaintiff informed Defendant that he was represented by counsel. (*Id.*) He also asked for "an explanation of how [it] calculated the arrears set forth in the Pennsylvania Act 91 Notices [it] sent [him], given that [he] ha[d] been paying [his] agreed upon trial payments continuously." (*Id.*) Plaintiff declared that his letter was a "Qualified Written Request" pursuant to 12 U.S.C. § 2605. (*Id.*) After failing to receive a response, he then sent a third letter to the same location, dated April 13, 2011, repeating the same requests. (*Id.* ¶ 65, Ex. H.)

Several days before Defendant received the third letter, PHFA informed Defendant that it had denied the request for emergency mortgage assistance. (Doc. No. 16, Ex. C.) On April 20, 2011, Defendant's Fort Worth, Texas office sent Plaintiff a letter indicating that it had received his correspondence and he should "expect a complete response within twenty (20) business days." (*Id.* ¶ 66, Ex. I.) Two days later, Plaintiff received an identical letter. (*Id.*)

Defendant's Simi Valley, California location—the location where Defendant initially directed Plaintiff to send his "Qualified Written Requests" to on the notice with the RESPA information—sent him a letter dated April 28, 2011, which included a loan history statement purportedly in response to his earlier requests. (*Id.;* Doc. No. 16, Ex. B.) On May 3, 2011, the Simi Valley office sent another letter advising Plaintiff that his "request has been forwarded to the appropriate department for further research." (Doc. No. 14 ¶ 66, Ex. I.)

Plaintiff filed this lawsuit on October 20, 2011. As of that date Defendant still had not provided him with the information he initially requested about the loan modification offer, the calculation of the arrears and the mortgage default balances. (*Id.* ¶ 67.)

## III. LEGAL STANDARD FOR MOTION TO DISMISS

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in the Supreme Court's Opinion *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678, 129 S.Ct. 1937 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

is entitled to relief.' " *Id.* (quoting Fed. R. Civ. Proc. 8(a)(2)).

Applying the principles of *Iqbal* and *Twombly*, the Third Circuit set forth a three-part analysis that a district court in this Circuit must conduct when evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir.2010) (quoting *Iqbal*, 556 U.S. at 675, 679, 129 S.Ct. 1937). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir.2011).

## IV. DISCUSSION

### A. Legality of Property Inspection Fees

Defendant charged Plaintiff $262.50 for property inspections conducted after his loan went into default. Plaintiff was informed through pre-foreclosure notices and his monthly mortgage statement that he had to pay the amount charged for the inspections in order to cure the default.

Defendant's attempt to collect the fees, and the way in which the fees were communicated to him, form the basis of Plaintiffs claims that Defendant violated the Fair Debt Collection Practices Act ("FDCPA"), the Pennsylvania Loan Interest and Protection Law, the Fair Credit Extension Uniformity Act, and Pennsylvania common law.

Defendant has moved to dismiss all claims based upon the property inspection fees. For reasons that follow, Defendant's Motion to Dismiss will be granted on all claims relating to the property inspection fees.[9] The Court will discuss each claim individually, although not exactly in the order they are set forth in the Counts in the Amended Complaint.

### 1. Fair Debt Collection Practices Act, 15 U.S.C. § 1692e and § 1692f

Defendant demanded payment of property inspection fees in the November 8 and December 16, 2010 pre-foreclosure notices and in the January 4, 2011 monthly mortgage invoice. Plaintiff contends in Count I of the Amended Complaint that these demands were not permitted under Pennsylvania consumer protection law, nor authorized by the mortgage agreement, and as a result Defendant's representations were false in violation of both § 1692e and § 1692f of the FDCPA. The Court disagrees.

The FDCPA was enacted "to eliminate abusive debt collection practices by debt collectors" after Congress found "abundant evidence" of "deceptive" and "unfair" tactics being used by them. 15 U.S.C. § 1692(a), (e). "The Act entitles consumers to certain information regarding the nature of their debts . . . and pro-

---

**9.** The facts regarding the property inspection fees are the basis of the claims made in Counts I (FDCPA), III (Fair Credit Extension Uniformity Act), IV (Loan Interest and Protection Law), and V (Unjust Enrichment) of the Amended Complaint.

hibits debt collectors from engaging in certain conduct." *Allen ex rel. Martin v. LaSalle Bank. N.A.*, 629 F.3d 364, 367 (3d Cir.2011) (internal citations omitted). "The FDCPA is a remedial statute, and ... its language [is construed] broadly so as to effect its purposes." *Id.* It is "a strict liability statute to the extent it imposes liability without proof of an intentional violation." *Id.* at 368.

■ Courts must use the "least sophisticated debtor" standard when analyzing communications between debt collectors and debtors. *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d Cir.2011). The standard is not high, but it does " 'prevent liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.' " *Id.* (quoting *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354–55 (3d Cir.2000)). The specific provisions of the FDCPA at issue in this case are § 1692e and § 1692f.

### a. Pre–Foreclosure Notices and Mortgage Statement— § 1692e

Section 1692e prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Under § 1692e(2), it is a violation to make any "false representation of—(A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt." "The language of this provision creates a straightforward, objective standard." *Glover v. Fed. Deposit Ins., Corp.*, 698 F.3d 139, 149 (3d Cir.2012).

■ " 'A debt collection letter is deceptive where it can be reasonably read to have two or more different meanings, one of which is inaccurate.' " *Rosenau v. Unifund Corp.*, 539 F.3d 218, 222 (3d Cir.2008) (quoting *Brown v. Card Serv. Center*, 464 F.3d 450, 455 (3d Cir.2006)). For example, the Third Circuit has held that a debt collector would violate § 1692e if it "assert[ed] that it *could* take [a legal] action that it had no intention of taking and has never or very rarely taken before." *Brown*, 464 F.3d at 455 (3d Cir.2006). In another instance, a debt collection letter signed by the collector's "Legal Department," which was comprised solely of non-lawyers, was a violation of § 1692e because it falsely implied lawyers had sent the letter. *Rosenau*, 539 F.3d at 220–23; *see also Lesher*, 650 F.3d at 1003 (finding law firm debt collection letter violated § 1692e because firm name and logo printed at the top of the letter "falsely impl[ied] that an attorney, acting as an attorney, [was] involved in collecting" the debt); *Crossley v. Lieberman*, 868 F.2d 566, 571 (3d Cir.1989) (debt collector's letter violated § 1692e by threatening "to take action 'within one week' ... [which collector] knew because of [Pennsylvania law] he was not permitted to institute within one week").

In this case, Defendant informed Plaintiff on multiple occasions that he owed $262.50 for property inspections. The falsity of these demands allegedly arises from the limitations placed on debt collectors by the Pennsylvania Loan Interest and Protection Law (also known as "Act 6"). Act 6 requires mortgagees or lenders to send notice to delinquent borrowers of their intention to foreclose. Section 403(c) of the Act requires, among other things, the following:

The written [pre-foreclosure] notice shall clearly and conspicuously state:

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default *as provided in section 404* of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;

(4) The time within which the debtor must cure the default. . . .

41 Pa. Stat. § 403(c) (emphasis added). Section 404(b) reads, in relevant part, that:

To cure a default under this section, a residential mortgage debtor shall:

(1) Pay or tender . . . all sums which would have been due at the time of payment or tender in the absence of default . . . ;

(2) Perform any other obligation which he would have been bound to perform in the absence of default . . . , if any;

(3) Pay or tender . . . *the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment.*

(4) Pay any reasonable late penalty, if provided for in the security document.

*Id.* § 404(b) (emphasis added). Thus, while Section 403(c)(3) directs lenders to state the exact amount needed to cure the default, Section 404(b) limits that amount to certain items.

Pennsylvania courts have not set forth a test for determining whether a specific cost is reasonable in a proceeding to foreclosure. The ability of lenders to pass-through property inspection costs to defaulted borrowers has been addressed, however, by the United States Bankruptcy Court for the Eastern District of Pennsylvania. For example, in one case, a residential mortgage lender sought to collect $144 in property inspection fees as part of a debtor's Chapter 13 reorganization plan. *In re Sacko,* 394 B.R. 90, 104 (Bankr. E.D.Pa.2008). In analyzing the lender's claim, the court first looked to the mortgage agreement, noting the mortgage language was "broad enough to encompass property inspections." *Id.* at 105. The court noted, however, "the mere fact that a mortgage loan is delinquent, by itself, does not establish the necessity for property inspections at the borrower's expense." *Id.* A court must examine the facts of each case. *See id.* In *Sacko,* the court did not allow the collection of fees because the lender failed to present any evidence that the inspections were necessary after it was shown that the lender was in constant contact with the borrower during the foreclosure process. *Id.* at 105–06.

A different conclusion was reached *In re Cervantes,* 67 B.R. 816 (Bankr.E.D.Pa. 1986). In *Cervantes,* the court held that the lender was entitled to $106.80 in property inspection fees because 41 Pa. Stat. § 404(b)(3) and the mortgage agreement allowed such recovery. *Id.* at 821. There was no evidence in the case that the fee was unreasonable. *Id.*

In another case, the bankruptcy court denied the lender recovery of property inspection fees because the fees were not authorized under the mortgage agreement. *In re Burwell,* 107 B.R. 62, 66 (Bankr. E.D.Pa.1989). The court said it could "see little legal necessity for the mortgagee's making superficial periodic inspections to a mortgaged premises. Certainly, such inspections are unlikely to garner information which . . . [is] essential to proper prosecution of a foreclosure suit." *Id.* at 66. The court did note, however, that it was "not foreclosing the possibility of a mortgagee's convincing [the court] that, in a given specific factual situation, inspections might be sufficiently necessary . . . , e.g., if the premises were vacant or were

subject to waste because of certain specific circumstances." *Id.*

■ In the instant case, Plaintiff's legal theory—that Defendant's property inspection fees were not "reasonable" foreclosure costs under Pennsylvania law, and therefore false representations in violation of § 1692e(2) of the FDCPA—is one of first impression in the Third Circuit. Plaintiff does not allege the property inspections were fraudulent, but rather that conducting them was unnecessary and simply a way for Defendant to generate revenue after Plaintiff's default.[10] His attempt to turn the pre-foreclosure notices required under Pennsylvania law into an FDCPA claim is unprecedented. Based on the language of Act 6 and other relevant court decisions cited above, this Court is not convinced that Plaintiff's contentions rise to the level of a false or misleading representation under the FDCPA.

First, neither federal nor state law expressly prohibits lenders from charging defaulted borrowers for property inspections. It is not expressly forbidden by the FDCPA. As indicated by *Sacko*, *Cervantes*, and *Burwell*, courts have acknowledged situations in which it is appropriate in Pennsylvania for lenders to charge and recover such fees.

Second, Plaintiff defaulted on the loan and, similar to the situation in *Sacko* and *Cervantes*, paragraph fourteen of the mortgage agreement permits Defendant to charge for property inspections "for the purpose of protecting [its] interest in the Property."[11]

---

**10.** As noted above, on June 7, 2010 the FTC filed a Complaint against Defendant in the Central District of California alleging, among other things, that Defendant was charging defaulted borrowers for unnecessary property inspection fees. (*See* Doc. No. 22–2.) One week later, the case was resolved with a stipulated Consent Order and Judgment. (*See* Doc. No. 22–3.) Plaintiff relies on the facts contained in the FTC Complaint to support the assertion in this case that Defendant's property inspection fees are unreasonable. (*See* Doc. No. 14 ¶¶ 87–89.) An almost identical allegation was made by the plaintiff in *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F.Supp.2d 639 (E.D.N.Y.2012). In *Mendez*, the plaintiff relied on the same FTC case against Defendant in order to challenge the lawfulness of Defendant's default related service charges. *See id.* at 645. The *Mendez* court refused, however, to rely on the allegations of wrongdoing from the FTC case to support the alleged wrongdoing in the present case because (1) "the Consent Order and Judgment ... which was entered into by stipulation, [did] not make such a finding," and (2) the plaintiff "cannot rely on past conduct allegedly in violation of the FTC Act that was addressed by the FTC Complaint and subsequent Consent Order and Judgment to now assert that the Defendant's recent conduct also is necessarily in violation of that Act or other laws" *Id.* at 659. This Court agrees with the conclusion reached in *Mendez*. No unlawful conduct can be reasonably inferred from a prior lawsuit in another judicial district that was resolved with a Consent Order and Judgment which explicitly stated that "Defendants have not admitted any of the allegations of wrongdoing set forth in the Complaint, and entry of this Order is not an admission of any such allegations of wrongdoing or violation of law." (*See* Doc. No. 22–3 ¶ 14.)

**11.** Plaintiff does not dispute Defendant's right to charge for property inspections. At the March 13, 2012 court hearing, Plaintiff's counsel stated the following:

> So what does the mortgage tell us? It tells us that [Defendant] can make reasonable inspections of the property, that they can— if the borrower falls behind in payments, [Defendant] can do whatever's reasonable or appropriate to protect their interest. And paragraph 14 says more specifically that they can incur fees for services performed in connection with the borrower's default and those fees can include besides attorneys' fees, property inspections.

(Mot. Dismiss Hr'g Tr. 47:13–20, Mar. 13, 2012.) Nor does Plaintiff contend that the inspections were not actually conducted. (*See* Doc. No. 14 at 1, 20; Doc. No. 22 at 8.) Despite these concessions, Plaintiff is attempt-

Finally, unlike this case, the Third Circuit cases interpreting § 1692e of the FDCPA involve conduct by debt collectors who provided debtors with false or misleading information about the debt collection process. As noted above, in *Lesher*, a law firm logo was prominently displayed on collection letters, yet the firm was acting as a debt collector not an attorney. In *Rosenau*, the collection letter was signed "Legal Department," but the department contained no lawyers. In *Crossley*, the letter threatened legal action within one week, which is explicitly prohibited by Pennsylvania law. In this case, charging for a property inspection is authorized in the mortgage and is not barred from being collected by any law. In fact, as noted above, Section 404(b)(3) of Act 6 provides that to cure a default a residential mortgage debtor shall pay "the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment." Notifying a defaulted debtor that a property inspection fee is due is not a false statement under Act 6 or the FDCPA.

 Moreover, Plaintiffs contention that Defendant's January 4, 2011 mortgage invoice falsely represented its right to conduct properties inspections is equally unpersuasive. Plaintiff was in default when Defendant sent the January mortgage statement. The statement advised Plaintiff that his account was still "seriously delinquent" and stated the following: "As long as your loan remains delinquent, [Defendant] will conduct inspections of your property on a periodic basis. These inspections are provided for in your loan documents."

There is nothing false or misleading about this statement. Plaintiff's mortgage

specifically allows for property inspections. As noted previously, paragraph fourteen of Plaintiff's mortgage informs him that "Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the property and rights under this Security Instrument, including ... property inspection ... fees." The monthly mortgage statement directed Plaintiff to his loan documents for information on property inspections, and in those documents the right to inspect is clearly stated. For the foregoing reasons, the Court will dismiss Plaintiff's claim that Defendant violated § 1692e(2) as alleged in Count I.

### b. Loan Servicing Practices—§ 1692f

 Using the same facts described above regarding the property inspections, Plaintiff also alleges a FDCPA violation under § 1692f(1). Section 1692f prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt." Thus, "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) [is prohibited] unless such amount is expressly authorized by the *agreement creating the debt* or *permitted by law.*" § 1692f(1) (emphasis added). "The only inquiry under § 1692f(1) is whether the amount collected was expressly authorized by the agreement creating the debt or permitted by law...." *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d Cir.2011). The Third Circuit directly addressed § 1692f(1) in *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 406–08 (3d Cir.2000), adopting the following three-part analysis:

> If state law expressly permits service charges, a service charge may be im-

---

ing to change the clear language of the mortgage through statutory juggling in order to

justify his claim that the property inspection fees were improper false statements.

posed even if the contract is silent on the matter;

If state law expressly prohibits service charges, a service charge cannot be imposed even if the contract allows it;

If state law neither affirmatively permits nor expressly prohibits service charges, a service charge can be imposed only if the customer expressly agrees to it in the contract.

*Id.* at 407–08 (internal quotation and citation omitted).

In *Pollice,* Pittsburgh government agencies had thousands of claims against homeowners with delinquent taxes, water, and sewer charges. *Id.* at 385. The interest rate that municipal governments, such as Pittsburgh, could lawfully charge debtors was 10% annually under the Pennsylvania Municipal Claims and Tax Liens Law. *Id.* at 390. A local Pittsburgh ordinance, on the other hand, allowed debt collectors to charge rates up to 12%. *Id.* at 386. The Pittsburgh agencies sold the claims to debt collectors, who then charged the municipal debtors at the 12% rate. *Id.* at 385–86. Using the analysis set forth above, the Third Circuit held that the debt collectors violated § 1692f(1) because under Pennsylvania law only 10% could be charged. Under the second category, the debt collectors' rates were not permissible because they were in direct violation of state law.

*Id.* at 407. The debt collectors' actions were also not allowable under the third category, since homeowners had not expressly agreed to these interest and penalty rates when they applied for municipal services. *Id.* at 408.

■ Here, Plaintiff does not dispute that Defendant is permitted to charge property inspection fees. Rather, he contends that Defendant's practices, such as conducting automatic inspections for borrowers in default, is not permissible under the terms of the mortgage or relevant Pennsylvania law, and therefore is in violation of § 1692f(1). The Court disagrees. Using the *Pollice* test, Defendant's imposition of property inspection charges falls into the third category; that is, property inspection charges are neither affirmatively permitted nor expressly prohibited under Pennsylvania law and were expressly agreed to in the mortgage contract. There is no reference at all to property inspection charges in the Pennsylvania statutes at issue in this case. Accordingly, the fees can only be charged if expressly agreed to in the contract creating the debt. Unlike the situation in *Pollice,* the fourteenth paragraph of Plaintiff's mortgage agreement expressly allows Defendant to charge for conducting property inspections once a borrower is in default.[12] The Court

---

12. In *Mendez v. Bank of Am. Home Loans Servicing, LP,* 840 F.Supp.2d 639 (E.D.N.Y. 2012), the court reached a similar conclusion. The mortgage at issue in *Mendez,* which is nearly identical to paragraph fourteen of Plaintiff's mortgage, stated the following:

Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees....

*Id.* at 656. The plaintiff claimed breach of contract and deceptive practices under New York General Business Law based on the defendant's allegedly excessive property inspection fees. *Id.* at 656–59. In *Mendez,* as in this case, the court dismissed the plaintiffs claims because: (1) there was "no plausible claim that the inspection fees charged by the [d]efendant were in violation of any express terms of his actual mortgage contract," and (2) the "actual mortgage contract contained no express limitation on the appropriate amount of default related servicing fees." *Id.* at 657, 659; *see also Dougherty v. Wells Fargo Home Loans, Inc.,* 425 F.Supp.2d 599, 607 (E.D.Pa.2006) (dismissing § 1692f(1) claim challenging mortgage company's right to

will therefore dismiss Count I of the Amended Complaint, which alleges violations of both § 1692e and § 1692f.

## 2. Loan Interest and Protection Law, 41 Pa. Stat. § 101

In Count IV of the Amended Complaint, Plaintiff alleges that, apart from the FDCPA, Defendant's property inspection fees also violate Act 6, the Pennsylvania Loan Interest and Protection Law. For reasons that follow, the Court will grant Defendant's Motion to Dismiss Count IV.

As noted above, Act 6 requires lenders to provide notice of an intention to foreclose on a residential mortgage. 41 Pa. Stat. § 403. Section 403(c) specifically requires that lenders send written notice containing, among other things, "[t]he right of the debtor to cure the default as provided in Section 404." *Id.* § 403(c)(3). Section 404 not only covers the right to cure a default, but also permits a lender to include certain items in the amount necessary to cure the default. The amounts are set forth in Section 404(b) and, as noted previously, are limited to the following:

(1) Pay or tender in the form of cash, cashier's check or certified check, all sums which would have been due at the time of payment or tender in the absence of default and the exercise of an acceleration clause, if any;

(2) Perform any other obligation which he would have been bound to perform in the absence of default or the exercise of an acceleration clause, if any;

(3) Pay or tender any reasonable fees allowed under section 406 [i.e., attorney's fees] and *the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage*

*lender actually incurred to the date of payment.*

(4) Pay any reasonable late penalty, if provided for in the security document. *Id.* § 404(b) (emphasis added). Section 504 permits individual lawsuits against lenders that violate the provisions of Act 6 where damages are incurred. Section 504 reads in full:

Any person affected by a violation of the act shall have the substantive right to bring an action on behalf of himself individually for damages by reason of such conduct or violation, together with costs including reasonable attorney's fees and such other relief to which such person may be entitled under law.

In this case, Plaintiff alleges that the property inspection fees were unlawful under Section 404(b) because they were not "reasonable costs of proceeding to foreclosure," and therefore he is entitled to damages pursuant to Section 504. Because Plaintiff has not yet paid the inspection fees, Defendant argues that he cannot bring suit under Section 504 because he has not suffered any damages. Neither Act 6 nor the Pennsylvania courts have further defined the term "damages" as used in Section 504. Therefore, the Court must follow the rules laid out in the Pennsylvania Statutory Construction Act, 1 Pa. Cons.Stat. § 1501 et seq., in order to determine the meaning of "damages" in Section 504.

"[T]he legislative intent behind the statute's enactment controls its meaning and application." *United Cerebral Palsy v. Workmen's Comp. Appeal Bd.*, 543 Pa. 544, 673 A.2d 882, 887 (1996) (citing 1 Pa. Cons.Stat. § 1921(a); *Frontini v. Commonwealth Dep't of Transp.*, 527 Pa. 448,

---

charge borrower for attorney's fees because "paragraph 7 [of the mortgage] expressly authorizes [the mortgage company] to pay costs to protect the value of the mortgaged property, including attorney's fees, and to charge [the borrower] for such fees").

593 A.2d 410, 411–12 (1991)). To ascertain legislative intent, a court should consider, among other things, "[t]he occasion and necessity for the statute," "[t]he circumstances under which it was enacted," and "[t]he mischief to be remedied." 1 Pa. Cons.Stat. § 1921(c). Additionally, a court should "interpret statutes or parts of statutes that are *in pari materia* together as one statute." *Narberth Borough v. Lower Merion Twp.*, 590 Pa. 630, 915 A.2d 626, 634–35 (2007) (citing 1 Pa. Cons.Stat. § 1932(b)). "[A]ll sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute." *Hous. Auth. of the County of Chester v. Pa. State Civil Serv. Comm'n*, 556 Pa. 621, 730 A.2d 935, 945 (1999) (citations omitted).

■ Following these rules of statutory interpretation, the Court first looks to the purpose of Act 6. Federal and state courts—in explaining and applying the provisions of Act 6 at issue in this case—have consistently defined the Act in the following manner. Act 6 is a "'comprehensive interest and usury law with numerous functions,' one of which is that 'it offers homeowners with 'residential mortgages' a measure of protection from overly zealous 'residential mortgage lenders.'"" *In re Graboyes*, 223 Fed.Appx. 112, 114 (3d Cir.2007) (quoting *Beckett v. Laux*, 395 Pa.Super. 563, 577 A.2d 1341, 1343 (1990)). "The comprehensive statutory scheme demonstrates an extensive program designed to avoid mortgage foreclosures." *Bennett v. Seave*, 520 Pa. 431, 554 A.2d 886, 891 (1989). In the residential mortgage context, the Act is "typically raised as a defense to mortgage foreclosure proceedings." *Id.* (citations omitted).

■ Thus, the remedy for a defective Act 6 notice, such as the pre-foreclosure notice at issue in this case, is typically to set aside the foreclosure or deny a creditor the ability to collect an impermissible fee. *See, e.g., In re Smith*, 866 F.2d 576, 578, 586 (3d Cir.1989) (holding lender's failure to properly send pre-foreclosure notice to Plaintiff's new address before initiating foreclosure suit gave rise to a cause of action for damages under Section 504 of Act 6); *id.* at 586 (citing *Main Line Fed. Sav. & Loan Ass'n v. Joyce*, 632 F.Supp. 9, 10 (E.D.Pa.1986) (noting proper pre-foreclosure notice is jurisdictional prerequisite for foreclosure action)); *id.* (citing *In re Sharp*, 24 B.R. 817, 821 (Bankr. E.D.Pa.1982) (setting aside foreclosure where lender failed to determine debtor's last known address)); *In re Burwell*, 107 B.R. 62, 67–68 (Bankr.E.D.Pa.1989) (denying creditor ability to collect property inspection fees on foreclosed mortgage in debtor's bankruptcy proceeding). The purpose of Act 6, as shown by the cases above, is to help residential homeowners reacquire property that has been lost, or to prevent the imminent loss of money or property, because of the impermissible actions of residential mortgage lenders.

When Section 504 is read in conjunction with other sections of Act 6, the word "damages" only refers to the loss of money or property. Section 504 falls within Article V of the Act. Article V lists the "Remedies and Penalties" available to those that have been affected by an Act 6 violation. Within Article V, Sections 501 through 504 address the items that are recoverable for such a violation. Section 501, which is entitled "Excessive interest need not be paid," permits a debtor to reduce the amount of his debt by the amount of interest being charged in excess of the statutory maximum, even if the debtor has not actually paid the excessive interest at the time of the lawsuit. Specifically, Section 501 states:

When a rate of interest for the loan or use of money, exceeding that provided

by this act or otherwise by law shall have been reserved or contracted for, the borrower or debtor shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be lawful for such borrower or debtor, at his option, to retain and deduct such excess from the amount of such debt providing the borrower or debtor gives notice of the asserted excess to the creditor.

Section 502, which is entitled "Usury and excess charges recoverable," allows a debtor to recover excessive interest and other impermissible charges that he has actually paid to his creditor, and, within a certain time frame, triple the amount paid. Section 502 reads in full:

> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges: Provided, That no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced within four years from and after the time of such payment. Recovery of triple the amount of such excess interest or charges, but not the actual amount of such excess interest or charges, shall be limited to a four-year period of the contract.

Section 503 permits a debtor to recover the reasonable fees paid to his attorney after prevailing in an Act 6 lawsuit. Lastly, as noted above, Section 504 permits individuals to bring suit "for damages" against those that have violated any provision of the Act.

The relationship between Sections 501, 502, and 504—for purposes of interpreting the word "damages" in Section 504—is most instructive. In Section 501, the legislature expressly permits a debtor to recover for excessive interest charges despite the fact that the debtor has not yet paid the unlawful amount. Section 501 only allows this remedy, though, for unlawful interest, not other unlawful charges. Other unlawful charges, such as those that are not reasonable in proceeding to foreclosure, are addressed in Section 502. Section 502 only allows recovery of other unlawful charges when such amounts have actually been paid to a creditor. The legislature has therefore singled out excessive interest charges as money that can be recovered before being paid; other excess charges can only be recovered after being paid. Neither Sections 501 nor 502 address lost property, but, consistent with the purpose of Act 6, "damages" in Section 504 has been read, as noted in the cases above, to include loss of property. However, to read "damages" in Section 504 to also include a creditor's unlawful yet unpaid charge, would render Sections 501 and 502 superfluous. There would be no need for the legislature to have drawn the distinction between paid and unpaid interest and other charges, if all unlawful charges could be remedied through the "damages" language in Section 504.[13]

---

13. This conclusion is further supported by the maxim of statutory interpretation *expressio unius est exclusio alterius* (the express mention of one thing excludes all others). This principle can be a useful guide so long as it does not conflict with any rules set forth in the Pennsylvania Statutory Construction Act. *See St. Elizabeth's Child Care Ctr. v. Dep't of Pub. Welfare,* 600 Pa. 131, 963 A.2d 1274, 1275, 1278 (2009). Here, the legislature expressly mentioned unpaid excessive interest as a recoverable item in an Act 6 lawsuit. It

Therefore, based on the above analysis, the Court concludes that the word "damages" used in Section 504 encompasses only the actual loss of money or property. Here, Plaintiff cannot recover under Act 6—regardless of whether the property inspections fees were "reasonable costs of proceeding to foreclosure"—because he has not established that he suffered any damages as required by Section 504. Plaintiff has not paid the inspection fees nor suffered any other loss that would fall within the ambit of actual loss of money or property, such as a lien on his property or the loss of his home in foreclosure.[14] His lawsuit was filed prematurely.[15] Accordingly, the Court will grant Defendant's Motion to Dismiss Count IV of the Amended Complaint.

### 3. Fair Credit Extension Uniformity Act, 73 Pa. Stat. § 2270.1

For reasons that follow, the Court also will grant Defendant's Motion to Dismiss Count III of the Amended Complaint alleging a violation of the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 Pa. Stat. § 2270.1 et seq., as enforced by the remedial provision of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201–9.2. Section 2270.4(a) of the FCEUA states:

> It shall constitute an unfair or deceptive debt collection act or practice under this act if a debt collector violates any of the provisions of the Fair Debt Collection Practices Act. . . .

A violation of the FCEUA "shall constitute a violation of the . . . Unfair Trade Practices and Consumer Protection Law ["UTPCPL"]." *Id.* § 2270.5(a). Since the FCEUA does not provide individuals with the right to institute private causes of action for violations, individual plaintiffs must use 73 Pa. Stat. § 201–9.2, the remedial provision of the UTPCPL, to obtain relief. Therefore, the law governing UTPCPL claims also governs Plaintiff's FCEUA claim in this case.

"[T]he UTPCPL is to be liberally construed to effectuate its objective of protecting the consumers of this Commonwealth from fraud and unfair or deceptive business practices." *Ash v. Cont'l Ins. Co.*, 593 Pa. 523, 932 A.2d 877, 881 (2007). In a private UTPCPL action, a plaintiff must prove that he "suffer[ed] [an] ascertainable loss of money or property, real or

---

therefore follows that the express mention of unpaid interest excludes the recovery of other types of unpaid charges.

**14.** Plaintiff cites *Albanese v. Portnoff Law Assocs., Ltd.*, 301 F.Supp.2d 389, 403 (E.D.Pa. 2004), for the proposition that merely charging for property inspections can give rise to Act 6 liability. But *Albanese* differs from this case in two key respects. First, the plaintiff's failure in *Albanese* to pay delinquent trash collection fees, and interest charged on those fees, caused the defendant to obtain a lien on plaintiff's property. A lien on property is sufficient to show damages under Section 504. Second, the plaintiff in *Albanese* brought suit under Sections 501 and 502 of Act 6. Section 501 expressly allows an individual to bring suit for excessive interest rate charges without requiring a plaintiff to actually pay those charges first. Thus, Plaintiff in the instant case must point to something more than merely being billed for property inspections in order to bring suit under Section 504 of Act 6.

**15.** It seems anomalous, if Plaintiff's position is correct, that a borrower who fails to make his monthly mortgage payments, for whatever reason, and then fails to pay a service fee as agreed to in the mortgage contract after a default, can sue the lender for money damages for being charged for the service allowed by mortgage. A mortgage once properly executed is a contract which binds the parties to its terms. *See Fid. Nat'l Title Ins. Co. v. Craven*, No. 12–4306, 2012 WL 5881856, at *10 (E.D.Pa. Nov. 21, 2012) (noting three mortgages were proper basis for breach of contract claim under Pennsylvania law).

personal, as a result" of defendant's actions. 73 Pa. Stat. § 201–9.2; *see also Weinberg v. Sun Co.,* 565 Pa. 612, 777 A.2d 442, 446 (2001). While the Pennsylvania Supreme Court mandates a liberal construction of the UTPCPL, lower court cases and the plain language of the statute indicate an actual loss of money or property must have occurred to state a cognizable UTPCPL claim. *See, e.g., Brock v. Thomas,* 782 F.Supp.2d 133, 137 (E.D.Pa. 2011) (Plaintiff alleged loss of title to his Philadelphia residence because of Defendant's fraudulent conduct); *Baynes v. George E. Mason Funeral Home, Inc.,* No. 09–153, 2011 WL 2181469, at *5 (W.D.Pa. June 2, 2011) (Plaintiff had proven loss of money when he purchased defective steel casket instead of solid bronze one that was advertised). A plaintiff must be able to point to money or property that he would have had but for the defendant's fraudulent actions. *See Rubenstein v. Dovenmuehle Mortg., Inc.,* No. 09–721, 2009 WL 3467769, at *6 (E.D.Pa. Oct. 28, 2009) (dismissing UTPCPL claim against mortgage company because plaintiffs could not show an ascertainable loss from mortgage company's failure to immediately disclose that they did not have plaintiffs' complete mortgage payment history); *Solarchick ex rel. Solarchick v. Metro. Life Ins. Co.,* 430 F.Supp.2d 511, 516 (W.D.Pa.2006) ("A party cannot lose what she does not or will not have, and cannot be compensated for a loss not suffered.").

In this case, Plaintiff has not identified an "ascertainable loss of money or property" that he suffered to establish a UTPCPL claim. Defendant charged Plaintiff $262.50 for property inspections.

According to the Amended Complaint, Plaintiff has not paid the $262.50 fee. This fee is an outstanding liability, but does not constitute a "loss of money or property." [16] Without actually paying for the allegedly improper inspection fees, Plaintiff's FCEUA claim, as brought under the UTPCPL, in Count III of the Amended Complaint fails because of his inability to show an "ascertainable loss of money or property" required by the statute.

### 4. Unjust Enrichment

The Court will also grant Defendant's Motion to Dismiss the unjust enrichment claim in Count V of the Amended Complaint. Plaintiff has a mortgage contract that allows Defendant to collect property inspection fees from borrowers in default. Pennsylvania law precludes him from bringing an unjust enrichment action when the relationship of the parties is based on a written contract.

"An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law." *Sevast v. Kakouras,* 591 Pa. 44, 915 A.2d 1147, 1153 n. 7 (2007) (citing *Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (1969)). "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *AmeriPro Search, Inc. v. Fleming Steel Co.,* 787 A.2d 988, 991 (Pa.Super.2001) (citation omitted). "The Supreme Court of Pennsylvania has concluded that 'the quasi-contractual nature of unjust enrichment [is] *inapplicable* when the relationship be-

---

**16.** In Plaintiff's Supplemental Memorandum, he argues that the imposition of property inspection fees was "an increase in [his] mortgage debt and corresponding loss of home equity" and thus an "ascertainable loss" under the statute. (Doc. No. 22 at 27.) The fallacy of this argument stems from the fact that Plaintiff has not sold his home. He therefore has no actual loss from this increase in his liabilities. At this point, the loss is merely a possible loss, which is insufficient to establish a UTPCPL claim.

tween the parties is *founded on a written agreement or express contract.'*" *Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985) (quoting *Schott*, 259 A.2d at 448) (emphasis added). Thus, "[d]ismissal of an unjust enrichment claim is appropriate upon a motion to dismiss when the relationship between the parties is founded on a written instrument." *Harold ex rel. Harold v. McGann*, 406 F.Supp.2d 562, 579 (E.D.Pa.2005) (citations omitted).

■ Here, Plaintiff has a direct contractual relationship with Defendant that is governed by the written home mortgage agreement. The agreement addresses numerous topics, including Defendant's ability to charge for property inspections if Plaintiff defaults—as he admittedly did—on his mortgage payments. Plaintiff has a right, of course, to challenge the reasonableness of those charges, but a theory of unjust enrichment is not the proper legal vehicle. The Court will therefore dismiss Count V of the Amended Complaint.

### B. Sufficiency of Pre–Foreclosure Notices Pursuant to Pennsylvania Foreclosure Prevention Act and 15 U.S.C. § 1692e

In Count II of the Amended Complaint, Plaintiff makes another claim, albeit for a different reason, that Defendant violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e. The violation consists of Defendant's action in providing him with pre-foreclosure notices that contained false or misleading information about his legal rights under the Pennsylvania Foreclosure Prevention Act (also known as "Act 91"), § 35 Pa. Stat. § 1680.401c et seq. Specifically, in the Amended Complaint, Plaintiff contends that Defendant misinformed him that: (1) he only had thirty days—instead of thirty-three days—to have a face-to-face meeting with a counseling agency; (2) his ability to apply to the Home Emergency Mortgage Assistance Program ("HEMAP") ended after thirty-three days; and (3) Defendant's logo and payment stub were improperly included on the pre-foreclosure notices.[17] Because these statements do not violate any of the prohibitions contained in 15 U.S.C. § 1692e, the Court will grant Defendant's Motion to Dismiss Count II of the Amended Complaint.

■ As noted previously, § 1692e prohibits debt collectors from using false or misleading representations "in connection with the *collection* of any debt." *Id.* § 1692e (emphasis added). More than sixteen different illegal practices are listed in § 1692e, such as false statements about "the character, amount, or legal status of any debt" and "threat[s] to take any action that cannot legally be taken or that is not intended to be taken." *Id.* Although the list is not exhaustive, § 1692e clearly seeks

---

17. Specifically, the Amended Complaint states that Defendant's logo and payment stub were improperly placed on "what was supposed to be an official, state-mandated form, thereby obfuscating the purpose of the notice." (Doc. No. 14 ¶ 110c.) Section 1680.402c(a) requires an Act 91 notice "be given in a form and manner prescribed by the [Pennsylvania Housing Finance Agency]." Section 1680.403c(b)(1) directs the Pennsylvania Housing Finance Agency to prepare a form notice that meets the specific requirements set forth in the statute, and allows lenders and others to send the notice to borrowers. There is nothing, however, in the plain language of Section 1680.402c, Section 1680.403c, or the Pennsylvania Housing Finance Agency's form notice, 12 Pa.Code § 31 app. A, that prohibits lenders from placing their logos or payment stubs on an Act 91 notice. Nor does Plaintiff cite any case law to show the contrary. Accordingly, in addition to the reasons set forth below, the placement of Defendant's logo and payment stub on the Act 91 notices is not a false or misleading statement in violation of § 1692e.

to curb abusive practices tied to the "collection" of consumer debt.

▪ The purpose of Act 91 is, among other things, to "give a homeowner the chance to apply for a state loan to help pay off the mortgage in situations where the homeowner cannot meet his mortgage payments because of unemployment, before foreclosure occurs.'" *Ayers v. Phila. Hous. Auth.*, 908 F.2d 1184, 1187 (3d Cir. 1990) (quoting *Bennett v. Seave*, 520 Pa. 431, 554 A.2d 886, 892 (1989) (Papadakos, J., concurring)). For example, debt collectors must provide defaulted borrowers with notice that they "may qualify for financial assistance under the Homeowner's Emergency Mortgage Assistance Program." 35 Pa. Stat. § 1680.403c(b)(1). Debt collectors must advise borrowers that they have "thirty (30) days, plus (3) days for mailing, to have a face-to-face meeting with a consumer credit counseling agency to attempt to resolve the delinquency or default." *Id.* The Act permits an "application for mortgage assistance [to] be submitted to [HEMAP] beyond the thirty (30)-day period." *Id.* § 1680.403c(b)(7).

▪ The FDCPA and Act 91 serve different purposes. The FDCPA is aimed at restricting the activities of debt collectors, whereas Act 91 ensures debtors are aware of the potential for state-funded assistance. While both statutes are often implicated in the debt collection process, not every inaccurate statement made during that process is actionable under the FDCPA. *See Carlson v. First Revenue Assurance*, 359 F.3d 1015, 1018 (8th Cir.2004) ("The FDCPA

was designed to provide basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation.").

▪ In this case, Plaintiff points to language in Defendant's pre-foreclosure notices that supposedly misled him about how and when he could apply for state-funded mortgage assistance. But these representations—regardless of their accuracy—do not relate to Defendant's attempt to collect the outstanding mortgage debt. Rather, the statements provided Plaintiff with information about a state-run program designed to help him with his difficult financial situation. Defendant's statements did not mischaracterize the legal status of his mortgage debt, nor did the statements misrepresent how much he owed or Defendant's legal right to collect the debt.[18] Since Defendant's representations relating to Act 91 do not fall within the express or implied prohibitions set forth in § 1692e, the Court will dismiss Count II of the Amended Complaint.

### C. Adequacy of Responses to Qualified Written Requests Under Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e)

Plaintiff contends that Defendant violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e), by failing to adequately respond to Plaintiff's multiple written requests for information about its loan modification offer and the method used to calculate his outstanding mortgage debt. For reasons that follow,

**18.** The state law remedy for a defective Act 91 notice is to stay foreclosure proceedings or dismiss the lender's foreclosure action for lack of jurisdiction. *See, e.g., Beneficial Consumer Disc. Co. v. Vukman*, 37 A.3d 596, 603–04 (Pa.Super.Ct.2012) (vacating judgment and setting aside sheriff's sale because "Act 91 explicitly states that, before a mortgagee

can even commence a mortgage foreclosure action, it must give the mortgagor the notice described in Section 1680.403c"). Here, Defendant never initiated a foreclosure action, and therefore Plaintiff has no remedy under state law for the alleged Act 91 misrepresentations.

the Court will deny Defendant's Motion to Dismiss Count VI of the Amended Complaint.

RESPA was enacted after Congress found "that significant reforms in the real estate settlement process [were] needed to insure that consumers throughout the Nation [were] provided with greater and more timely information on the nature and costs of the settlement process." *Id.* § 2601(a). One such reform is the duty RESPA imposes on loan servicers to respond to borrowers' inquiries about their mortgages within a certain time frame. *See id.* § 2605(e). Section 2605(e) states the following:

(1) Notice of receipt of inquiry

(A) In general

If any servicer of a federally related mortgage loan receives a qualified written request from the borrower ... for information relating to the servicing of such loan, *the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days* ... unless the action requested is taken within such period.

(B) Qualified written request

For purposes of this subsection, a qualified written request shall be a written correspondence ... that—

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry

*Not later than 60 days ... after the receipt from any borrower of any qualified written request ... the servicer shall—*

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) *after conducting an investigation, provide the borrower with a written explanation or clarification that includes—*

(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

*Id.* § 2605(e)(1)-(2) (emphasis added).

██ A loan servicer is permitted to "establish a separate and exclusive office and address for the receipt and handling of qualified written requests" from borrowers. 24 C.F.R. § 3500.21(e)(1). In order

to trigger duties under RESPA, a loan servicer must actually receive a qualified written request from a borrower. *Morilus v. Countrywide Home Loans, Inc.*, No. 07–0900, 2007 WL 1810676, at *3 (E.D.Pa. June 20, 2007). Courts have dismissed RESPA claims where plaintiffs failed to properly send written requests to their loan servicers. *See, e.g., Griffin v. Citifinancial Mortg. Co., Inc.*, No. 05–1502, 2006 WL 266106, at *2 (M.D.Pa. Feb. 1, 2006) (dismissing RESPA claim where plaintiff sent request to Citifinancial's bankruptcy attorney rather than Citifinancial itself).

■■■ In addition to alleging a breach of a duty required to be performed under RESPA, a plaintiff must also show that the breach caused him to suffer damages. *Hutchinson v. Del. Sav. Bank FSB*, 410 F.Supp.2d 374, 383 (D.N.J.2006) (citing 12 U.S.C. § 2605(f)(1)(A) ("Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure … [for] any *actual* damages to the borrower *as a result* of the failure ….") (emphasis added)). "Actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence." *Cortez v. Keystone Bank, Inc.*, No. 98–2457, 2000 WL 536666, at *12 (E.D.Pa. May 2, 2000).

The Third Circuit has not specifically addressed whether "actual damages" also encompasses non-pecuniary damages, such as mental and emotional suffering, although other circuits have found that RESPA does include such damages. *See Catalan v. GMAC Mortg., Corp.*, 629 F.3d 676, 696 (7th Cir.2011); *McLean v. GMAC Morg. Corp.*, 398 Fed.Appx. 467, 471 (11th Cir.2010) ("Construing the term 'actual damages' broadly, and based on the interpretations of 'actual damages' in other consumer-protection statutes that are remedial in nature, plaintiffs arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA.").

■■■ Here, Defendant Bank of America clearly notified Plaintiff that any qualified written requests must be sent to its office in Simi Valley, California. On February 4, March 11, and April 13, 2011, Plaintiff instead sent written requests to Defendant's office in Pittsburgh, Pennsylvania, seeking information about Defendant's loan modification offer and how his mortgage default was calculated. Because no written request was sent to its offices in Simi Valley, California, Defendant argues that Plaintiff's requests did not trigger any duties under RESPA. The Court disagrees.

First, nowhere in the plain language of 12 U.S.C. § 2605(e) or 24 C.F.R. § 3500.21(e)(1), *supra*, is a borrower required to send his requests to a loan servicer's specified address; the law simply allows a loan servicer to establish such a place. What is required, though, is that the loan servicer actually receive the borrower's request for information. Here, although Defendant has divisions in Pittsburgh, Simi Valley, and throughout the country, each office is still under the management and control of Defendant.

Second, Defendant's Simi Valley office eventually received Plaintiff's requests but failed to respond in accordance with the requirements of RESPA. Although Plaintiff's requests for information were sent to the Pittsburgh office, Plaintiff was ultimately contacted by the Simi Valley office in a letter dated April 28, 2011, which confirms that Defendant was aware in April 2011 of Plaintiff's request for information about the loan modification offer

and his mortgage default amount. On May 3, 2011, Plaintiff received a second letter from the Simi Valley office informing him that his request had been sent to the appropriate department for research. RESPA required Defendant to provide information about its investigation into these requests within sixty days of receiving the requests. Yet, as of October 2011, when Plaintiff initiated this lawsuit, Defendant had not answered his requests for information.

Defendant also contends that even if its RESPA duties were triggered, Plaintiff has not pled sufficient facts to show he suffered actual damages as a result. The Court again disagrees. Plaintiff alleges he "has suffered fear, anxiety and other emotional distress" as a result of Defendant's actions. The Court finds it reasonable to infer that a borrower in default who repeatedly seeks—yet fails to obtain—information about his financial situation could have damages for mental and emotional suffering. Therefore, the Court will deny Defendant's Motion to Dismiss Count VI of the Amended Complaint.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss Counts I through V of the Amended Complaint, and will deny the Motion to Dismiss Count VI of the Amended Complaint. An appropriate Order follows.

### ORDER

**AND NOW,** this 7th day of January 2013, upon consideration of Defendants' Motion to Dismiss (Doc. No. 16), Plaintiff's Response in Opposition (Doc. No. 22), Defendants' Reply (Doc. No. 24), arguments of counsel at the March 13, 2012 hearing, Plaintiff's Supplemental Memorandum in Opposition (Doc. No. 28), Defendant's Reply (Doc. No. 31), Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss (Doc. No. 32), and Plaintiff's Response (Doc. No. 33), it is **ORDERED** as follows:

1. Defendants' Motion to Dismiss (Doc. No. 16) is **GRANTED in part and DENIED in part.**

2. The following Counts are **DISMISSED WITH PREJUDICE:**

 - Count I—FDCPA, 15 U.S.C. § 1692e(2) and § 1692f(1), for charging the property inspection fees

 - Count II—FDCPA, 15 U.S.C. § 1692e, for improper Pennsylvania pre-foreclosure notices

 - Count III—Fair Credit Extension Uniformity Act, 73 Pa. Stat. § 2270.1 et seq., for FDCPA violations

 - Count IV—Pennsylvania Loan Interest and Protection Law, 41 Pa. Stat. § 101 et seq., for charging the property inspection fees

 - Count V—Unjust enrichment

3. The following Counts will remain open in the Amended Complaint:

 - Count VI—Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), for insufficient responses to mortgage loan information requests

 - Count VII—Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), for providing negative reports to credit bureaus

 - Count VIII—15 U.S.C. § 1692c(a)(2), c(c), d(5), for continually contacting Plaintiff after knowing he was represented by an attorney

4. Defendants shall file an Answer to the Amended Complaint within twenty (20) days of the date of this Order.